# EDWARD O'LEARY

## vs.

## WILLIAM H. LAWRENCE, Administrator.

*Marriage—Presumptions—Legitimacy.*

A legal marriage is only presumed from general repute and habit, and where the presumption is met by counter presumption of innocence, the former presumption must give way, and the first marriage must be established as an actual fact by more direct proof. p. 151

Where parties live together as husband and wife, demeaning themselves towards each other as such, and especially if they are received into society and treated by their friends and relatives as married, the law will, in favor of morality and decency, presume that they have been legally married. p. 152

The law always presumes in favor of legitimacy. p. 152

If after the birth of one claiming to be legitimate, though born a bastard, there be cohabitation of the father and mother, the latter assuming the name of the former, and the parties treat each other as man and wife, and treat the claimant as their child, and they are treated as, and reputed to be, man and wife by their friends and acquaintances, these are facts from which marriage may be inferred. p. 152

Even if there were a presumption of marriage of a woman and a man growing out of their relations, this presumption may be overcome by subsequent relations between the woman and another man, which would have been criminal assuming her marriage to the former man, the presumption of innocence in the second case overcoming the presumption of marriage in the first. p. 153

*Decided March 3rd, 1921.*

Appeal from the Orphans' Court of Baltimore City.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*Rowland K. Adams,* for the appellant.

*Lewis Hochheimer,* submitting the cause on brief, for the appellee.

ADKINS, J., delivered the opinion of the court.

William J. O'Leary died in February, 1920, intestate. William H. Lawrence, having been appointed administrator of his personal estate, on August 5th, 1920, filed a petition in the Orphans' Court of Baltimore City, in which he stated there had come into his hands as administrator the sum of $3,551.39; that at the time of the death of the decedent he was a widower and left no children surviving him, but that the administrator has been advised that the nearest relative was one William Fritz, a grandchild, the son of a deceased daughter, Cora Fritz, nee O'Leary; that while the administrator was advised that the said grandchild was the only person entitled to the personal estate of the said William J. O'Leary, it was possible there might be others unknown to the administrator who would be entitled to a distributive share in said estate. The petition therefore prayed for an order authorizing and directing him to appoint a meeting of all persons entitled to distributive shares of the estate. Such an order was passed and notice published in accordance therewith, as a result of which two petitions were filed by rival claimants, one in behalf of the said William Fritz by his father as his natural guardian, in which it is alleged that the said William Fritz is the grandchild and next of kin of the decedent; and one by certain nephews and nieces, who allege that the decedent died unmarried and without leaving any children or descendents, and leaving said petitioners as next of kin. After a full hearing, in which a number of witnesses testified, the Orphans' Court decided that William Fritz was the grandson of the decedent and directed the administrator

to distribute to him the residue of the estate after having
paid the costs of administration. The case comes up in an
appeal from that order.

It is not disputed that the mother of William Fritz, who
before her marriage was known as Cora O'Leary, was law-
fully married to his father, but the nephews and nieces deny
that she was the daughter of the decedent, or at any rate
that she was his legitimate child. One of the nieces, Mrs.
Mary E. French, testified that Cora was born while her
mother was living with a man named Wisner as his wife, and
that on one occasion, when Cora was four or five years old,
her mother came to the home of witness' mother, where dece-
dent was then living, and asked for him. "She says to my
mother: 'I want to see William O'Leary'; and my mother
said, 'What right have you got to see him'? She says, I
want to talk to him; I am going to leave Mr. Wisner and I
want him to live with me. My mother had my sister there,
and she said, I have a little girl like—meaning my sister—
she said, it is William's little girl." "The girl she was re-
ferring to was this girl Cora." "Q. At that time did you
know her as Mrs. O'Leary or Mrs. Wisner? A. Mrs. Wis-
ner; and from the time she died I always spoke of her as
Mrs. Wisner or Cora, as Cora Wisner." Witness further
testified that none of decedent's relatives, except her father's
family, lived in Baltimore, most of them living in Frederick;
that they all regarded him as a single man and considered
his relations with Cora's mother as illicit; that none of them
ever visited him while he was living with her; that Mr. Wis-
ner left her about the time her uncle went to live with her
and went to Germany; that her uncle was boarding at Mr.
Wisner's house when Cora was born; that her uncle said he
was single; that some day he would pay Mrs. O'Leary off and
send her to Germany; that he spoke of her as the boarding
house lady and the old woman; that Mrs. O'Leary said some
day she hoped they would get married. This witness, when
asked whether or not they were known in the community as
husband and wife, answered: "They might be in the com-

munity." She also said she never visited them, and did not
know how they lived together and spoke of each other. "Q.
You never had occasion to look directly into the question as
to whether they were husband and wife, did you? A. Never.
Q. Do you know whether Cora spoke of them as her parents?
A. She spoke of them as her parents. Q. Did you ever come
in contact with him very much? A. No, sir; not very much.
Q. You would say your acquaintance, as far as coming in
contact with him is concerned, is rather less than that of the
other witnesses? A. It was."

It does not appear whether the alleged declarations of Mr.
& Mrs. O'Leary, testified to by Mrs. French, were made be-
fore or after they began living together.

Mrs. Wright, another niece and one of the claimants, testi-
fied her uncle was living with Cora's mother, but she was
never acknowledged "as a relative of ours," that so far as
she knew he was never married; that she never heard him
introduce her as his wife; that he never visited any of his
relatives with her. "Q. Do you know his reputation in the
City of Frederick among his relatives? Was he known as
married or single? A. To my knowledge I believe he was
acknowledged as a single man among his friends."

Witness further testified that she did not know how they
were generally regarded in the community by people who
knew them; that she knew nothing about their conduct to-
wards each other, as she never associated with them; that she
never heard her uncle say he was not married; that he was
very quiet and never talked much about his business.

One other witness, Alexander Coulter, testified that he had
discussed the matter three or four times with Mrs. French
and Mrs. Wright and their mother and brothers, and had
heard them say their uncle was not married; that he did not
know whether or not he and Mrs. O'Leary were recognized
as husband and wife by other people.

A number of witnesses, all of whom, except the father of
the alleged grandchild, appear to be disinterested, and all of
whom lived in the neighborhood in Baltimore City where

Mr. & Mrs. O'Leary resided, testified that they held themselves out always as husband and wife, and spoke of Cora as their daughter and William Fritz as their grandson, and were very fond of them. When Cora was married, she and her husband lived with Mr. and Mrs. O'Leary until Cora's death, and after her death the boy was left with them for a while at Mr. O'Leary's request. They lived together as one family. Some of these witnesses had known Mr. & Mrs. O'Leary for fifteen years and knew them intimately. All of them testified that they were generally recognized as husband and wife; she was admitted to a hospital as Mrs. O'Leary and that is the name by which she was buried. They lived together from about 1886 until Mrs. O'Leary was taken to Bay View Hospital, where she died in 1913. She appeared to have been married, as she wore a wedding ring, and a marriage certificate hung on the wall, but the witnesses who testified to these facts could not say what name appeared either in the ring or in the certificate.

Unfortunately there is no positive and direct proof of a marriage between the decedent and the woman with whom he lived for more than twenty-five years. But on the other hand there is no proof that the woman known as Mrs. O'Leary was ever married to Wisner, even if full credit be given to the testimony of appellants. So we are left largely to legal presumptions.

The result of a careful analysis of the decisions in this State applicable to the facts of the present case (and every phase of the case is so fully covered by these decisions as to make unnecessary reference to other authorities) is as follows:

A legal marriage is only *presumed* from general repute and habit, and where the presumption is met by the counter presumption of innocence, the former must give way, and the law requires that the first alleged marriage shall be established as an actual fact by more direct proof. *Jones* v. *Jones,* 45 Md. 144; *Jones* v. *Jones,* 48 Md. 391.

When parties live together ostensibly as husband and wife, demeaning themselves towards each other as such, and especially if they are received into society and treated by their friends and relatives as having and being entitled to that status, the law will, in favor of morality and decency, presume that they have been legally married. *Jones* v. *Jones,* 48 Md., at p. 403; *Redgrave* v. *Redgrave, 38 Md. 93; Richardson* v. *Smith,* 80 Md., at p. 93.

The law always presumes in favor of legitimacy. *Barnum* v. *Barnum,* 42 Md., at p. 296.

While it is true that, where there is no impediment to marriage, and the connection between the parties was illicit in its commencement, it will be presumed to continue to be of the same character, and in order to overcome that presumption, it will be necessary to adduce other evidence than that of cohabitation of the parties to establish their marriage; yet if after the birth of a person claiming to be the legitimate child of his parents, though born as a bastard, there be cohabitation of his father and mother, the latter assuming the name of the former, and the parties treat each other as man and wife, and treat the claimant as their child, and they are treated as, and reputed to be, man and wife by their friends and acquaintances, these are facts proper to be submitted to the jury, from which marriage may be inferred, notwithstanding the original illicit connection between the parties. *Jones* v. *Jones,* 45 Md., at pp. 155-156.

"Marriage may doubtless be proved, in civil cases other than actions for seduction, by reputation, declarations and conduct of the parties; but where reputation is relied on, that reputation, to raise the presumption of marriage, must be founded on general, not divided or singular opinion; and where reputation in such cases is divided it amounts to no evidence at all. And so with respect to the declarations of the parties; the value of such declarations as evidence will always depend upon the circumstances under which they were made."

The above quotation is from the case of *Barnum* v. *Barnum,* 42 Md., at pp. 297 and 298, where the overwhelming weight of testimony as to reputation and declarations was against marriage, and there was comparatively little in support of it. In *Jackson* v. *Jackson,* 80 Md., at p. 189, this Court said that when there was a conflict in the testimony as to general reputation the question should be submitted to the jury.

Accepting all the testimony on both sides as true, we find that when Cora was born her mother was living with Wisner, and O'Leary was boarding with them. The only testimony that Cora's mother and Wisner were married is the simple general statement of Mrs. French to that effect; but she does not say she saw them married, or even that she knew anything about the reputation as to their relations. In fact she was only eight years old when Cora was born. The mother did not tell her Wisner was her husband, but she did tell her that O'Leary was the child's father, that she was going to leave Wisner and wanted O'Leary to live with her. Even if there were a presumption of marriage between her and Wisner growing out of their relations, this presumption would be overcome by the subsequent relations between her and O'Leary, which would have been criminal assuming her marriage to Wisner. The presumption of innocence in the second case would overcome the presumption of marriage in the first, even if otherwise there were enough evidence to raise such presumption.

The only question therefore is, leaving her former relations with Wisner out of consideration, does the evidence in this case raise a presumption of marriage between O'Leary and the woman known as Mrs. O'Leary? The Orphans' Court, which had the benefit of the presence of the witnesses and an opportunity to observe their demeanor, held that it did.

The only people who appear not to have accepted Mr. and Mrs. O'Leary as man and wife were certain relatives, who apparently had almost forgotten his existence until after his death, when notice to the next of kin to appear was pub-

lished. They chose, without taking the trouble to investigate, to assume the absence of a marriage, notwithstanding Mr. and Mrs. O'Leary lived together for nearly twenty-five years, during which time appellants confessedly had no association with them, and knew nothing of how they were holding themselves out to the public, or of how they were regarded in the community in which they lived. It is significant that the only disinterested witness who testified for appellants was a friend of theirs who knew nothing except through them. It is also worthy of note that four of appellants did not take the stand to corroborate their sisters in regard to the family reputation.

It is hardly disputed that Cora was O'Leary's daughter, born out of wedlock; and there is abundant proof that he acknowledged her as his child.

Under all the testimony we think the Orphans' Court was justified in holding that a legal presumption of marriage had been established, and the child thereby legitimated.

*Order affirmed, with costs to appellees.*