HANNAH A. REDGRAVE *vs.* SAMUEL H. REDGRAVE, Administrator of Dr. THOMAS J. REDGRAVE.

*Witness not competent under the Acts of 1864, ch. 109, and 1868, ch. 116—Legal presumption of Marriage— When the Validity of a Foreign Marriage is recognized in this State—Particular Marriage when asserted, to be proved affirmatively, &c.*

A woman claiming the right as the widow of a deceased person to administer upon his estate, is not competent under the Act of 1864, ch. 109, as modified by the Act of 1868, ch. 116, to testify as to the *factum* of her marriage with the intestate.

When parties live together ostensibly as man and wife, demeaning themselves toward each other as such, and are received into society, and treated by their friends and relations as having and being entitled to that status, the law will, in favor of morality and decency, presume that they have been legally married.

Where proof is offered from which a marriage may be inferred, the presumption is that it was duly and legally contracted according to the law of the

Redgrave *vs.* Redgrave, Admr.

place or country in which it occurred; and when contracted in a foreign State or Country, the validity of such marriage is recognized in this State, although it may not have been attended with the same formal ceremonies as are required for the celebration of a valid marriage by the law of Maryland.

Where, upon a question of marriage, a person assumes to prove that a valid marriage was celebrated on a particular occasion as testified to by a party to the transaction, it is incumbent upon the person asserting such marriage, to show affirmatively that it was in all respects in conformity to law; and failing in this, he will not be permitted to rely upon other facts and circumstances of the case as the ground of a presumption, that a marriage may have taken place between the parties on some other and different occasion from that spoken of by the witness.

APPEAL from the Orphans' Court of Baltimore city.

The appellant, on the 17th of December, 1872, filed her petition in the Orphans' Court of Baltimore City, alleging that she was married to Dr. Thomas J. Redgrave, on the 10th of August, 1856; that he departed this life on or about the 19th of June, 1871, leaving the petitioner, his widow, and one son, De Witt Clinton Redgrave, aged about fifteen years, surviving him; and that letters of administration on the estate of her deceased husband had been granted to his father, the appellee, on the 21st of June, 1871, without notice to her of the application for such letters. The petitioner claiming to be entitled, as widow of the deceased, to administer upon his estate, prayed that the letters of administration already granted might be revoked, and that letters might be issued to her. The appellee answered on the 2nd of January, 1873, neither admitting nor denying that there was a formal marriage between the appellant and the deceased, but denied that there was a legal marriage between the parties, and affirmed, and offered himself ready to verify, that at the time of said alleged marriage, a true and lawful wife of the deceased Dr. Thomas J. Redgrave was living, and was still living. The respondent submitted that in consequence of such prior marriage, the alleged

marriage of his son with the petitioner was null and void. Evidence was presented by the respective parties, which will be found sufficiently set forth in the opinion of this Court. The Orphans' Court, on the 8th of March, 1873, passed an order dismissing the petition; and from this order the present appeal was taken.

The cause was argued before BARTOL, C. J., STEWART, GRASON and ALVEY, J.

*E. Calvin Williams* and *John Stewart,* for the appellant.

*Daniel Radcliffe,* for the appellee.

ALVEY, J., delivered the opinion of the Court.

This case presents the question of the right of the appellant, claiming to be the widow of the late Doctor Thomas J. Redgrave, to administer on the estate of the deceased, her alleged husband.

The appellee, the father of the deceased, to whom letters of administration had been granted by the Orphans' Court, before the application of the appellant was presented, in his answer to such application, neither admitted nor denied that there was a formal marriage between his son and the appellant, as alleged by her, but he affirmed and offered ready to prove, that at the time of the alleged marriage with the appellant, a true and lawful wife of his son was then and is still living; and that, in consequence of such prior marriage, the alleged marriage of the son with the appellant, if it occurred, was null and void.

The appellant, on the trial in the Orphans' Court, supported her claim by the testimony of several witnesses, as to facts of cohabitation, declarations and conduct of the deceased, showing that she had been in the fullest manner treated and regarded as his lawful wife. She also testified

herself as to the celebration of the marriage, the place where it occurred, by what minister solemnized, and other facts attending their cohabitation as husband and wife, as also under what circumstances they were separated. But although no objection appears to have been taken to the competency of the appellant as a witness in the Court below, such objection is taken in this Court; and, as there is no rule requiring the objection to be taken in the Orphans' Court, it can be taken here for the first time, and, if well founded, must be sustained. And that she is an incompetent witness to prove the facts testified to by her, under the Act of 1864, as modified by the Act of 1868, is unquestionable. It was so expressly decided in the case of *Denison vs. Denison,* 35 *Md.,* 361, and her incompetency has been conceded by her counsel.

But, putting aside her testimony, other witnesses, of whom there is no impeachment or suspicion of their good faith, give ample evidence of facts from which a lawful marriage may be inferred. They prove that the marriage, as understood from the parties themselves, took place in 1856, at Prairie Du Chien, in the State of Wisconsin; and that, soon after the marriage, the parties went to Keokuk, in the State of Iowa, where they remained together for a period of from two to three years. That during this time, they held themselves out as, and represented themselves to be husband and wife; and that their conduct in all respects consisted with that relation. That they were known to and recognized by the brother and sister of the appellant, in Keokuk, and others in that community, as husband and wife; and that, during the period of their cohabitation, two children were born of their union. It also appears that the fact of this marriage was known to the brother and sister of the deceased, and, as we may reasonably infer, to the rest of the father's family; for it is proved by Mrs. Watkins, that, in the summer of 1859, the deceased introduced himself to her

in his brother's house, and informed her that he had married her sister-in-law, the appellant, and, at the same time, informed her that he had, as well as she could recollect, two children ; and that the brother, his wife, and his sister, were present at the conversation. And notwithstanding the family possessed this information, none of them appeared at the trial to disclose their knowledge upon the subject. Why this was can only be matter of conjecture.

Evidence of such facts as those just stated, when clear of suspicion, has always been received as competent and sufficient upon which to found a presumption, as matter of fact, of the existence of legal marriage. Where parties live together ostensibly as man and wife, demeaning themselves towards each other as such, and are received into society and treated by their friends and relations as having and being entitled to that status, the law will, in favor of morality and decency, presume that they have been legally married. 1 *Taylor's Ev.*, sec. 140, 517 ; *Hervey vs. Hervey*, 2 *W. Bl.*, 877 ; *Goodman vs Goodman*, 28 *L. J.*, ch. 1 ; *Jewell vs. Jewell*, 1 *How. U. S.*, 219, 232. Indeed, the most usual way of proving marriage, except in actions for criminal conversation, and in prosecutions for bigamy, is by general reputation, cohabitation and acknowledgment. *Sellman vs. Bowen*, 8 *Gill & John.* 50 ; *Boon vs Purnell*, 28 *Md.*, 607.

This case is altogether unlike that of *Denison vs. Denison*, 35 *Md.*, 361. In that case the question presented was, not upon facts from which legal marriage could be presumed, but whether lawful marriage could be contracted in this State merely *per verba de præsenti*, or *per verba de futuro cum copula*. In this case, proof has been offered from which marriage can be inferred ; and, in such case, the presumption is, that the marriage was duly and legally contracted according to the law of the place or country in which it occurred ; and, when contracted in

a foreign State or Country, the validity of such marriage is recognized here, although it may not have been attended with the same formal ceremonies as are required for the celebration of à valid marriage by the law of this State.

The evidence offered by the appellant was not at all controverted by the appellee ; but the appellant's claim to administration was attempted to be answered and refuted by showing a prior marriage of the deceased with a woman by the name of Riall or Riley, residing in the city of Baltimore, and who was living, without having been divorced, at the time of the alleged marriage of the deceased to the appellant.   Of course, if this prior marriage, thus set up by the appellee, be established as a valid marriage, it effectually bars and precludes all claim of the appellant.

But has it been shown that this alleged prior marriage in ˙Baltimore was ever in truth celebrated according to the law of this State?   The testimony offered to establish the fact of this marriage is not only suspicious, but involves such gross improbabilities as to cast discredit upon the whole pretense of such marriage.

We gather from the evidence that the woman Riall or Riley, was at the time of the alleged marriage, of a lewd and degraded character.   She seems to have been known by the name of both Riall and Riley, but better known as "Maggie Riley," than as Margaret Riall.   The police officers, who were examined as witnesses, speak of her as a bad character.   She was produced as a witness, however, to prove the *factum* of marriage with the deceased, in 1854.   And the appellee having assumed to prove that a valid marriage was celebrated on the particular occasion testified to by this witness, herself being a party to the transaction, it was incumbent upon him to show affirmatively that such marriage was in all respects in conformity to law ; and, failing in this, he cannot be permitted to rely upon other facts and circumstances of the case as the

ground of a presumption that a marriage may have taken place between the parties on some other and different occasion from that spoken of by the witness. *Blackburn vs. Crawford*, 3 *Wall.*, 175.

It appears that this woman Riall or Riley, was boarding or staying at the house of a man by the name of Hentz, who kept a drinking and eating house; and according to her testimony, she left the house where she was staying and went to the office of the deceased, adjoining the dwelling of his father, and was there married on the 23rd of November, 1854, by the Rev. Doctor Roberts. After the marriage, she and her alleged husband returned to the house of Hentz, where there was a marriage entertainment. When asked who were present at the performance of the marriage ceremony, she could only mention the names of those who have since died. Doctor Roberts is dead, and the other two persons named by her are dead also. Why she should have left the house of a friend, where she was boarding, and where the marriage feast was to be given, and have gone to the office of her intended husband, and that next door to the dwelling of his father who does not appear to have known any thing of the occurrence, there to be married, is wholly unexplained, and it seems remarkably strange, to say the least of it. She is the sole witness to the fact of this alleged marriage. No other witness is produced to speak of the celebration of the marriage; and it follows that if her testimony as to this fact be discredited by the other facts and circumstances of the case, the defence relied on to defeat the claim of the appellant must fail.

That the facts of the case do discredit her testimony. is too plain to escape observation. In the first place, by the examination of the record in the proper office, it does not appear that a marriage license was ever obtained; a thing that would not likely have been neglected, if a legal and proper marriage had been intended, and in fact celebrated.

It is not probable that a minister of character and standing in the city would have officiated without such license, thereby incurring the penalties of the law. The registry of marriages kept by the minister referred to, was produced on the trial, (without objection,) and that is silent as to any such marriage as that now set up. Then again, the witness never assumed the name of the alleged husband, and, out of the house of Hentz, never appeared to have passed for, or been known, even among those with whom she was well acquainted, as the wife of the deceased. She says she lived with the deceased about a year, "off and on." But where she lived, or how she lived, with the exception of the month at Hentz's, does not appear. She retained her name of Riall or Riley up to the time of her marriage with Brown, whose name she now bears; and this marriage with Brown took place in the lifetime of the deceased, without a pretense that a divorce was ever obtained.

These facts certainly tend strongly to cast doubt and discredit upon the story of the witness, and when we add to these facts the evidence of several witnesses who speak of her character as having been bad, and that they could not believe her on oath, we can have no hesitation in declining to give credit to her evidence, the belief in which would strongly reflect upon the character of a respectable minister of the gospel, and subject herself to the consequences of the crime of bigamy, to say nothing of the crime thereby imputed to the deceased. We think all the probabilities of the case strongly militate against the truth of her testimony.

The only circumstances that would seem in any degree to corroborate the testimony of this witness, are the notice in the newspaper, and the declarations and conduct of the deceased while he and the witness were at the house of Hentz.

As to the notice, that was certainly attended with suspicion. It would appear as if there was a design in it to mislead as to the parties. The minister was mentioned not as Doctor Roberts, but as the Rev. Mr. Roberts. The professional title of the deceased was altogether omitted, and the initials of his christian name wrongly given. The christian name of the female was omitted, and neither the residence of the parties, except as being of Baltimore, nor the place where the marriage occurred was mentioned. These peculiarities in the notice, when taken in connection with what occurred in regard to it between the deceased and his friend Hentz, are calculated to excite suspicion as to the motive of its publication. Hentz swears that the deceased called his attention to the notice, not because of any omissions or peculiarities in it, but simply to acknowledge it as the notice of his marriage, and that he, Hentz, thereupon cut out the notice and carried it in his pocket for several years. Why this calling attention to the notice, and acknowledging it, and having it preserved so carefully, if it were but an ordinary notice of a marriage? There must have been some motive or object connected with this notice more than usually attends notices of the kind; some object intended to be accomplished by it, which, in the nature of things, would not likely be disclosed in this case, except by way of inference.

Then, as to the declarations and conduct of the deceased, they appear to have been of a peace and in keeping with the publication of the notice. The motive that induced the one act, certainly prompted the others. But although he may have introduced the witnesses, who have testified to the fact, to the woman as his wife, in Hentz's bar-room; and though he may have said that he was married to her, and, under the circumstances disclosed, called her his wife, yet these facts are quite insufficient to satisfy the mind, in the light of all the evidence in the cause, that there was ever a valid marriage celebrated between the

parties.   That this woman for a time bore the relation of concubine or kept mistress to the deceased, would seem to be quite certain; and all his pretense of marriage with her could only have been made as a blind to screen their illicit conduct, and as means of deception as to their true relations to each other.   This, we think, is the most rational conclusion that can be drawn from all the circumstances of the case.

The question of the competency of the female witness Brown, although raised by the counsel of the appellant, we have not deemed it necessary to decide; but have assumed her to be competent to testify, and treated her testimony accordingly.   She, however, has asserted no right as against the estate of the deceased.

Concluding as we do, that the alleged prior marriage of the deceased never in fact, and in truth occurred, and that he was lawfully married to the appellant, and that she, as his widow, is entitled to administer on his estate, we shall reverse the order appealed from, and remand the cause that the Orphans' Court may revoke the letters heretofore granted to the appellee, and grant letters of administration to the appellant as the party lawfully entitled thereto.

> *Order reversed, and*
> *cause remanded,*
> *with costs to the appellant.*

(Decided 22nd May, 1873.)