## BECK v. UTAH-IDAHO SUGAR CO. et al.

No. 3690.   Decided December 30, 1921.   (203 Pac. 647.)

1. MARRIAGE—PRESUMED THAT ILLEGAL COHABITATION CONTINUED. Where woman became plural wife of man when plural marriages were prevalent in the state, and continued to live with him without any apparent change in the relation after the death of the legal wife, there is a presumption of law that their living together as husband and wife continued to be unlawful.

2. MARRIAGE—DECLARATIONS OF DECEASED COMPETENT TO DISPROVE CLAIM OF MARRIAGE. Declarations of a decedent are competent to disprove a claimed marriage with him, especially where a common-law marriage is claimed, and the fact of marriage is rendered improbable by reason of a prevalence of plural marriages at the time.

3. MARRIAGE—EVIDENCE HELD TO SUSTAIN FINDING OF NO LEGAL MARRIAGE. In an action by one claiming to be wife of a decedent to recover a one-third interest in real property under Comp. Laws 1917, § 6406, a finding of the trial court that no legal marriage was entered into *held* sustained by the evidence.

Appeal from District Court, Fourth District, Utah County; *A. B. Morgan*, Judge.

Action by Bertha G. Beck against the Utah-Idaho Sugar Company and others. Judgment for defendants, and plaintiff appeals.

AFFIRMED.

*Morgan & Huffaker* and *Walton & Walton,* all of Salt Lake City, for appellant.

*Young & Moyle,* of Salt Lake City, for respondents.

CORFMAN, C. J.

Appellant brought this action to establish her right to and

recover from the Utah-Idaho Sugar Company, a one-third interest in certain real property, under the provisions of Comp. Laws Utah 1917, § 6406, which provides:

"One-third in value of all the legal or equitable estates in real property possessed by the husband at any time during the mar- riage, and to which the wife had made no relinquishment of her rights, shall be set apart as her property in fee simple if she sur- vive him."

Briefly stated, it is alleged in the complaint that prior to June 16, 1897, appellant and one John Beck intermarried and thenceforth and until the death of said Beck on April 2, 1913, they continued to be husband and wife; that during said marriage said Beck was a resident of Utah, and was seized and possessed of certain real property in Utah county (describing same) which he conveyed by deed of trust to the Security Loan & Storage Company, a corporation, and that thereafter by mesne conveyances the Utah-Idaho Sugar Com- pany acquired the said property, and now denies appellant any rights therein; that appellant has never sold, conveyed, or in any manner relinquished her rights in or to the prem- ises. Appellant prayed to be adjudged the owner of one- third of the property; that it be partitioned if practicable, otherwise that she have judgment against the Utah-Idaho Sugar Company for the value of one-third the value of the property. Judgment was also demanded against the sugar company for one-third of the rents and profits of the prop- erty since it has had possession thereof. Appellant also prayed for general relief and costs.

The answer sets forth three separate defenses, to wit:

The first defense denies, upon information and belief, that appellant and John Beck intermarried. Seizure and posses- sion of the property by said Beck, also the sale thereof by him to the Securities Loan & Storage Company, as stated in the complaint, are admitted. As affirmative matters for a defense it is then alleged that the said John Beck conveyed and confirmed the property in trust to certain trustees to secure the payment of certain indebtedness contracted by him; that the aforesaid trust deeds were thereafter duly fore-

closed, and the property acquired under the foreclosures by the predecessors in interest of the Utah-Idaho Sugar Company. It is also alleged that said John Beck became a bankrupt; that the trustees sold and conveyed the interest of Beck in the premises to a predecessor in interest of the Utah-Idaho Sugar Company.

In the second defense it is pleaded in bar that in certain foreclosure proceedings against John Beck through which a predecessor in interest of the sugar company acquired the property appellant herein was made a party defendant; that she was duly served with summons and defaulted, and that thereupon the court found that all her right, title, and interest in the property involved in this action was subject to and subordinate to the rights and lien of plaintiff in said foreclosure proceedings, and entered its judgment and decree accordingly; that in the deed of trust so foreclosed said John Beck described and acknowledged himself to be a widower, and that in said trust deed so foreclosed John Beck did not merely grant, bargain, sell, and convey said property, but also confirmed the same unto the trustees therein named.

In the third defense it is averred that, even though appellant and the said John Beck did intermarry as alleged in the complaint, appellant is, by reason of her conduct, estopped from claiming any inheritance rights in the property described in her complaint for the following reasons: That in the year 1883, while John Beck was lawfully married to one Sarah Schilling Beck, he married appellant as a polygamous wife under the sanction and ceremonies of the so-called "Mormon" church; that thereafter within four years John Beck likewise married Matilda Goss and Louisa Goss as plural wives under the rites and sanction of said church; that said lawful wife died in 1894 and from thenceforth, and until his death said John Beck consorted and lived with his said plural wives as plural wives without distinction, supplying them with homes and with the necessaries of life, and habitually divided his time equally between them, except within the last few years of his life when he had fallen into abject poverty and had become ill he made his home with the said plural

wife Matilda Goss, who then alone cared for and supported him until his decease in April, 1913; that if the alleged lawful marriage between appellant and John Beck was ever in fact consummated it was in secret, without the formality of a license or the sanctity of any marriage ceremony whatever and therefore contrary to public policy under the statutes and peculiar conditions then obtaining in Utah, more especially in view of the previously existing polygamous status of appellant and the said John Beck. It is further alleged, with much detail, as to facts, that no change of the polygamous relations theretofore existing between the said John Beck and his several polygamous wives took place after the said alleged legal marriage; that the respondents and their predecessors in interest were familiar with the said plural or polygamous relationships, and at no time became acquainted or in any manner informed that the said John Beck had taken appellant as a legal wife, or that he ever treated or regarded her as such.

Upon the issues thus joined by the pleadings the trial court heard the evidence and found the facts to be substantially as set forth in the answer. From the facts found the court concluded as matters of law that appellant's claims were barred by laches and by reason of the foreclosure proceedings to which she had been made a party. The court also reached the conclusion that there was no legal marriage between appellant and John Beck, and entered judgment dismissing the complaint. Motion for new trial having been denied, the cause is brought to this court on appeal.

As grounds for reversal of the judgment of the trial court many alleged errors are assigned in the admission and rejection of evidence, but more especially appellant relies upon the insufficiency of the evidence to justify or support the findings and conclusions of law of the trial court, and particularly the conclusion arrived at "that the plaintiff [appellant] was not legally and lawfully married to said John Beck prior to the 16th day of June, 1897, nor was she prior to or since said date the lawful and legal wife of the said John Beck."

In brief, it appears from the evidence: That appellant came to Utah from Switzerland in September, 1883. Shortly after her arrival in Utah she became acquainted with John Beck and his wife. In June, 1884, she was married to John Beck as a polygamous wife according to the doctrines and rites of the "Mormon" church. She at once assumed the rôle of a plural or polygamous wife, and among her intimate friends and associates was known as "Sister Beck." For several years after said polygamous marriage, owing to the many criminal prosecutions of the time under the acts of Congress forbidding unlawful cohabitation, said polygamous marriage was kept largely a secret. For that reason appellant lived in seclusion, but always as the plural wife of John Beck. Two children were born as the fruit of said polygamous marriage. Shortly after the birth of the second child, in 1887, appellant accompanied John Beck on a trip to Germany, where they remained for three years, during which time she was known as "Mrs. Beck," and was introduced to people there by John Beck as "my wife," and, upon other occasions while maintaining polygamous relations with him, was introduced as "the wife" and known as "Mrs. Beck," while the legal wife was still living. In 1890 they returned to Utah and shortly afterwards, because of the continuance of criminal prosecutions in Utah for unlawful cohabitation under the Acts of Congress, appellant took up a residence in California under the assumed name of Mrs. Thomas. On the 7th of November, 1894, the legal wife of John Beck died. Appellant then returned to Utah and assumed and went under the name of Mrs. John Beck, and no further secrecy as to the polygamous marriage was maintained. Appellant then began to mingle in society, and was held out by John Beck as his legal wife, according to her testimony, and without the formalities of a legal marriage. During these times Mr. Beck was possessed with great wealth, and appellant and his other plural wives were provided with magnificent homes, and his wealth was lavished upon them alike in the highest degree. During these later times appellant testifies that she was assured that she was the legal wife of John Beck, and

did not realize her true position until a deed to real property was made out to her in her maiden name, Bertha Goss; that she then informed Mr. Beck that she would not continue her relations with him unless he made her his lawful wife; that Mr. Beck offered to make her his legal wife, and suggested the procuring of a marriage license from the county clerk, but she objected to that upon the ground that it would subject her to public ridicule and throw a cloud upon the legitimacy of her children; that after consulting with attorneys and intimate friends and close associates they were advised and concluded to go out of the state of Utah and contract and enter into a common-law marriage; that shortly after, accompanied by a party of friends, they made a trip by rail to San Francisco, and while en route, at Elko, Nev., before arising from their sleeping berth, Mr. Beck suggested that they enter into a marriage agreement, "He said: 'Bertha, I now take you as my wife. I agree to live with you and you alone.' I answered him and said: 'John, I accept you as my husband,' " Appellant also testified that then, or shortly afterwards, a ring was given to her by Mr. Beck as a wedding ring, and that upon their arriving in California and during their sojourn there Mr. Beck introduced her as his wife, and at social functions she was known as Mrs. John Beck.

Appellant's own testimony, corroborated by several witnesses, also shows that upon their return to Utah Mr. Beck continued to make his home with her; that they lavishly entertained, and that she was also introduced and known at social functions as "Mrs. Beck," or "Mrs. John Beck."

In still later years, the record shows, Mr. Beck became financially involved. It further shows that upon numerous occasions thereafter he sold real property and incumbered the same, including the property involved in this action, as a "widower" and at other times no marital status was defined or declared by his instruments of conveyance. The record further shows quite conclusively that until John Beck met with severe financial reverses and was reduced to a state of poverty he bestowed the same care and attentions upon

his other plural wives as he did upon appellant, by furnishing each of them with costly and beautiful homes and in providing for their individual comforts and welfare. Much evidence was also received tending to show that upon several occasions he expressly declared that no legal marriage had been entered into between himself and appellant. Matilda Goss, a cousin, and Louisa Goss, a sister, of appellant, both plural wives of Mr. Beck, testified that Mr. Beck had declared to them that he had not made appellant his legal wife. Lester Merill, a son-in-law of John Beck, having married a daughter of the first or legal wife, also testified:

"Q. Now, Mr. Merill, did you ever have any conversation with John Beck respecting his having made or making Bertha his wife? A. Yes, sir. Q. You may state the conversation. A. The date as near as I can fix the first, his comment or conversation in regard to it was the early summer of 1897. * * * We talked about various matters, and while at the table I don't recall whether we had completed the meal and just sat there talking or whether it was during the course of the meal. Mr. Beck told us * * * that Bertha was urging him to make her the legal wife, and that he would not do it because he proposed to keep all his wives on the same basis. Then he added, with a laugh, 'Besides, when I get ready to take a legal wife I have another woman already picked out.' Next time I recall his speaking of it—I recall it definitely—he was angry. Q. Fix the time. A. I should say in the spring of 1898, as near as I can place it. It was not very long, some few months prior to the time we left the house at 55 North State Street. * * * Mr. Beck told us that he and Mrs. Beck had had a very serious quarrel. Q. Which Mrs. Beck? A. Mrs. Bertha Beck I refer to. Had had a very serious quarrel. I don't know whether at the time he positively denied that he had been married to Mrs. Bertha Beck, but I remember his getting angry and saying, 'And she calls herself Mrs. John Beck.' Threw up his hands and said, 'She may call herself anything she * * * pleases if she will only give me peace.' The last time I remember of his speaking of the matter—Q. Just a moment. This is the third conversation? A. The one I am about to relate is the third. Q. Fix the date. A. Late in the fall of 1912. He was calling at our house at 333 Ninth East street. * * * We had talked of other matters, and Mr. Beck again introduced the question of his trouble with Mrs. Bertha Beck. He said that Mrs. Bertha Beck was again claiming to be his legal wife, but she could not prove it, because she was not, as near as my memory serves me. Q. Did you ever have any other conversation respecting this

matter? A. I cannot recall them positively, but I have very distinct impressions of his speaking of the matter sometimes in a jocular way, sometimes sarcastically, sometimes very earnestly. In fact Mr. Beck very seldom came to our house to visit us without bringing up the question of his trouble with Mrs. Bertha Beck, and very often her claims as to being his legal wife were spoken of, and, as I remember it, he invariably denied it."

The record further shows that after John Beck had been reduced to poverty and for some time prior to and during his last illness, he lived at the home provided by him for his plural wife Matilda, and that she, unaided, supported, cared for, and nursed him there until his death, while appellant was living elsewhere.

Appellant contends that her statements that a valid common-law marriage was entered into by an express agreement made between herself and John Beck on the 15th day of August, 1895, in the state of Nevada while they were passengers upon a train en route to California, stands wholly uncontradicted in the record, except for incompetent evidence admitted and received by the trial court as to the declarations made by John Beck during his lifetime, to the effect that no such marriage had ever been entered into, and that the appellant was not his legal wife. Moreover, it is argued in appellant's brief that immediately after the California trip there was a change in the relationship between the parties; that appellant occupied the station of and was held out to be the wife of John Beck in such a way before the general public as would, in the absence of direct evidence of a legal marriage, compel a finding that such a marriage relationship had been consummated and entered into. In support of this last-mentioned contention counsel have cited and quoted at length in their brief from the following cases: *Maryland* v. *Baldwin*, 112 U. S. 490, 5 Sup. Ct. 278, 28 L. Ed. 822; *Travers* v. *Reinhardt*, 205 U. S. 423, 27 Sup. Ct. 563, 51 L. Ed. 865; *Hamlin* v. *Grogan* (C. C. A. 8th Circ.) 257 Fed. 59, 168 C. C. A. 271; *Brewer* v. *Brewer's Estate*, 68 Colo. 84, 188 Pac. 725; *Redgrave* v. *Redgrave*, 38 Md. 93; *Jackson* v. *Jackson*, 80 Md. 176, 30 Atl. 752; *In re Meade's Estate*, 82 W. Va. 650, 97 S. E. 127. Also Schouler, Dom. Rel. (3d Ed.)

§ 26.  The foregoing authorities in effect hold and seem to
lay down the doctrine that where the parties are eligible to
enter into a valid marriage contract, live together ostensibly
as husband and wife without a formal marriage ceremony,
and they in good faith intend and believe themselves to be
such, and their demeanor toward each other in the presence
of their friends and relatives and the general public is that
of married people, the law will, when such a relationship has
long continued, presume them to be such.  Assuming, with-
out deciding, that such relationship, notwithstanding the
somewhat stringent marriage laws of our state, might be held
as constituting a legal marriage relationship, we have no such
a case here presented for our consideration, and therefore the
authorities relied upon by appellant have no application.   In
this case appellant, in the first instance, became the plural
wife of John Beck.  Their marriage relationship was unlaw-
ful from its inception, and so continued, as the record clearly
shows, for a long time both before and after the legal wife
had died.  The conduct of John Beck towards his plural
wives, including appellant, was impartial.  He cohabited
with each of them and spoke of them as his wives in their
presence, and held them out indiscriminately as such, both
in private and public life.  In his business affairs his con-
duct after the death of his legal wife was such as necessarily
precludes the thought that he at any time regarded any one
of them as being his legal wife.  That is made clear and cer-
tain by numerous disclosures and exhibits of his business
transactions which appear in the record.

But it is seriously contended by appellant's counsel that
the trial court should have been bound by the direct evidence
of appellant alone, that a valid marriage between herself and
John Beck took place in the state of Nevada in the manner
and under the circumstances testified to by her.  After tak-
ing into consideration the attending circumstances, the pre-
vious relationship, and the conduct of the parties toward each
other both before and after the alleged common-law marriage,
we are of the opinion that appellant's contention that a legal
marriage was consummated in the state of Nevada cannot be

sustained. We have seen that the cohabitation between appellant and John Beck was in the beginning and for many years afterwards unlawful. Therefore, as a legal proposition, the presumption is that their living together as husband and wife continued to be unlawful until a change was made to appear in such relationship. No showing is made in this record that the immediate friends and relatives, or the general public recognized after the alleged legal marriage any change in their demeanor toward each other that would imply that they were, or regarded themselves as having been, legally married. John Beck continued to live and cohabit with his other plural wives in the same way after the alleged legal marriage as before. Nothing is shown to have taken place in the business affairs of John Beck that would indicate that appellant had ever become a legal wife. She stood by and saw John Beck reduced from a state of wealth and affluence to one of abject poverty without ever manifesting any interest or particular concern. Then again, John Beck openly and avowedly, as has been pointed out, declared his intention to keep and regard all of his plural wives alike. He declared that he had not made appellant his legal wife, and that he never would do so. As to the competency of these declarations, which were admitted over appellant's objection, the authorities are not altogether harmonious, but we think the great weight of authority supports the respondents' contention that they are competent to disprove the claim of legal marriage. 26 Cyc. pp. 887, 888 (citing cases); Jones, Com. on Ev. § 312; 18 R. C. L. p. 425; *Topper* v. *Perry,* 197 Mo. 531, 95 S. W. 203, 114 Am. St. Rep. 777. It would be difficult to conceive how, in this jurisdiction where plural marriages were at one time prevalent and the practice of living in that relationship was for so many years indulged in, any other rule than that recognizing the admissibility of such declarations could in justice be held to apply, more especially in those cases where, as here, a common-law marriage is claimed and relied upon by appellant as having been entered into in a foreign state, and where the fact of marriage is rendered

so improbable by reason of the peculiar circumstances under which appellant claims a legal marriage took place.

For the reasons stated, we are of the opinion that the trial court was right and fully justified in its conclusion that appellant and John Beck were not legally mar-          3
ried, and in entering judgment dismissing her complaint. Judgment affirmed, with costs.

WEBER, GIDEON, THURMAN, and FRICK, JJ., concur.