81 A.3d 414

**Noel TSHIANI**

v.

**Marie–Louise TSHIANI.**

**No. 24, Sept. Term, 2013.**

Court of Appeals of Maryland.

Dec. 19, 2013.

John S. Weaver (Sarah I. Malik, Law Office of John S. Weaver, Rockville, MD), on brief, for Petitioner.

Judith A. Wolfer (Mary Pezzulla, Domestic Violence Legal Clinic House of Ruth of Maryland, Baltimore, MD), on brief, for Respondent.

Argued before: BARBERA, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, McDONALD, IRMA S. RAKER (Retired, Specially Assigned), JJ.

HARRELL, J.

A character portrayed by the actress Julia Roberts observed, "Happiness isn't happiness without a violin-playing goat." [1] If that be so, the live goat included as part of the dowry at a traditional marriage ceremony on 23 December 1993 in Kinshasa, Zaire,[2] marking Marie–Louise Ntumba's union with Noel Tshiani, was no Vivaldi.[3] Some fifteen years later, capped by an altercation in which Noel leveled allegedly a threat at Marie–Louise involving an AK–47 automatic rifle, the couple's relationship ended in a bitter divorce in Maryland, as this case reveals.

The parties chose to make the circumstances and significance of the Kinshasa ceremony the centerpiece of the present dispute. We piece together from the transcripts of trial testimony (primarily from Marie–Louise's testimony) and the findings of fact in the Memorandum Opinion by the hearing judge in the Circuit Court for Montgomery County, the following.

On 23 December 1993, Marie–Louise Ntumba, with her family, attended the ceremony in Kinshasa. They were joined

---

1. The character was Anna Scott in the film *Notting Hill* (Universal Pictures 1999).

2. Known as Zaire in 1993, the country is known presently as the Democratic Republic of the Congo.

3. Antonio Vivaldi was one of the most accomplished violinists in world history. Karl Heller, *Antonio Vivaldi: The Red Priest of Venice* (2003).

by members of the Tshiani family, all participants and attendees being of the Luba tribe.[4]   Noel, however, was not present physically in Kinshasa, but participated in the ceremony by telephone from another country.[5]   During the ceremony, Noel was asked three questions,[6] each of which he answered in the affirmative: "Do you know this girl?  Do you like this girl? Do you want us to give the dowery [sic] and the gift to this family so that you, this person can be your husband or wife?" Noel was said to be represented physically at the wedding site by his cousin.   In addition to a live goat, the dowry provided by the Kinshasa Tshianis to the Ntumbas included $200 U.S. in local currency, clothes, and food.[7]   Following the ceremony, the two families celebrated for eight or so hours.   After the celebration, Marie–Louise spent the night in Kinshasa at the home of a relative of Noel's, who was assisting with her travel paperwork.   She traveled a few days later to Virginia, United States, where she commenced to reside with Noel.

Noel and Marie–Louise lived together for almost fifteen years following the ceremony in Kinshasa.   After residing for some time at an apartment in Arlington, Virginia, the couple

---

**4.**  The Luba make up one of the three largest tribes of the Bantu peoples, the largest ethnic group in the Congo.

**5.**  Noel's location at the time of the ceremony is unclear from the record.   Marie–Louise testified that Noel was in another African country at the time on business, but did not recall the specific country.   Noel testified that he was in Virginia at the time, but, as discussed in more detail below, denied any involvement in the ceremony.

**6.**  The record is unclear also as to who, specifically, asked the questions of Noel. According to Marie–Louise's testimony, it suggests that one of the family members present at the ceremony posed them to Noel.

**7.**  Although a dowry in many cultures consists of money or valuables brought by the bride or her family to the groom or his family, scholarly research suggests that the dowry system among the Luba appears to be the opposite: when a couple marries, the groom may give gifts to the bride's family "in appreciation for all they have done in bringing her up, and in compensation for their loss of so valuable a member of their group." *See* Priscilla Berry & Agnes C.L. Donohugh, *A Luba Tribe in Katanga: Customs and Folklore*, 5 Africa: J. of the Int'l Afr. Inst. 178 (1932).

moved to Maryland where they resided, first in Bethesda and later in Potomac, until their separation.[8]  During the marriage, Marie–Louise gave birth to three boys, whom the couple raised together.  Through his employment at the World Bank, Noel obtained health insurance and other spousal benefits for Marie–Louise.  She also worked, mostly part-time, at daycare centers and schools for young children.  As the marriage deteriorated eventually, Marie–Louise moved out of the marital home with the three children and obtained protective orders against Noel based on allegations of spousal abuse.

In the divorce in 2011, the Circuit Court's judgment ordered Noel to pay Marie–Louise a $543,000.00 monetary award, $23,493.75 in attorneys' fees, indefinite alimony, child support for the parties' three children, and 50% of the marital portion of the pension and separation grant he may receive eventually from his employer.

## PERTINENT PROCEEDINGS BELOW

On 6 February 2009, Marie–Louise filed a Complaint for Absolute Divorce Or, In The Alternative, Limited Divorce in the Circuit Court for Montgomery County.  Her complaint alleged that the she and Noel were married in a religious ceremony in Arlington, Virginia, on 16 April 1994.  Marie–Louise filed, on 26 March 2010, an Amended Complaint for Absolute Divorce Or, In The Alternative, Limited Divorce in which she replaced her prior allegation of the Virginia wedding with an allegation that the parties were married on 23 December 1993 "in a Civil Ceremony in Kinshasa, Democratic Republic of the Congo." [9]

---

8. There was a brief period in which the couple moved to the African country of Chad for a work assignment of Noel's.

9. The record shows that Marie–Louise filed yet another complaint, titled "Amended Complaint for Absolute Divorce," on 18 October 2010 (one week before trial), in which she stated that she "re-alleges herein all of her allegations as stated in her *original* Complaint for Absolute Divorce" (emphasis added), and without any further reference to the Congolese ceremony alleged in her first Amended Complaint.  From a

A merits trial was held in the Circuit Court on 25–26 October 2010. At trial, Noel contested the divorce on the premise that he and Marie–Louise were never married legally. Following the trial, the Circuit Court issued a Memorandum Opinion in which it found that "it is undisputed that [Noel] was not physically present at the wedding ceremony," but "a valid marriage existed between the parties and took place on" 23 December 1993. The Circuit Court accepted Marie–Louise's testimony that Noel was not in the Congo at the time, but participated in the ceremony by telephone. On 7 January 2011, a Judgment of Absolute Divorce was issued in Marie–Louise's favor, as noted above.

Noel noted timely an appeal to the Court of Special Appeals. The intermediate appellate court, in a reported opinion, affirmed the Circuit Court's judgment that the parties' marriage in the Congo was valid, concluding that the marriage, where one party participated only via telephone, was not repugnant to the public policy of this State and should be recognized under comity principles as valid in Maryland. *Tshiani v. Tshiani*, 208 Md.App. 43, 56 A.3d 311 (2012). On 22 March 2013, this Court granted Noel's timely Petition for a Writ of Certiorari to consider the following questions:

Does Maryland recognize under the principles of comity foreign wedding ceremonies where the groom participated only by telephone?

Does Maryland require the physical presence of both parties at a wedding ceremony in order for the marriage to be valid? [10]

---

fair reading of the trial transcript, however, it appears that the parties and the Court proceeded to consider whether a divorce was proper based solely on the allegation of the Congolese ceremony.

10. We reverse the order of the questions presented in Noel's brief to this Court. We note also that the questions were phrased somewhat differently in Noel's Petition for Writ of Certiorari, where they were posed as follows:

Did the Circuit Court and Court of Special Appeals err in recognizing the parties' marriage in Kinshasa, Democratic Republic of the Congo under the principle of comity where Petitioner was not physically

As discussed in further detail below, we answer the first question in the affirmative and, on that basis alone, we shall affirm the judgment of the Court of Special Appeals. Because the facts of this case do not suggest that the wedding ceremony at issue involved a marriage that took place in this State, we need not address Noel's second question.

## STANDARD OF REVIEW

On appellate review of an action tried without a jury, we "review the case on both the law and the evidence," and we "will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." Maryland Rule 8–131(c). The questions of whether a valid marriage occurred, and whether Maryland should recognize such a marriage under the doctrine of comity are legal questions, and this Court reviews all questions of law without deference to the decisions of the courts below. *Khalifa v. Shannon*, 404 Md. 107, 115, 945 A.2d 1244, 1248 (2008).

## ANALYSIS

The Court of Special Appeals took correctly a two-step approach in analyzing whether Maryland should recognize, under the doctrine of comity, the Congolese marriage of the Tshianis, for the purposes of granting a domestic divorce. The intermediate appellate court determined first that Marie–Louise proved adequately to the Circuit Court that a valid marriage took place in the Congo, and then determined that Maryland courts should recognize the marriage under the principles of comity. Accordingly, we shall address likewise the arguments of the parties concerning proof of the validity

present at the wedding ceremony and stated over the telephone that he knew and liked the bride and agreed to exchanging gifts?

Is the physical presence of both parties required at a wedding ceremony in order for the marriage to be recognized as valid in Maryland?

of the Congolese marriage before addressing the question of comity.

## I.

### A.

██ Noel poses two primary arguments in support of the contended invalidity of the Congolese marriage ceremony. First, he argues that, where the parties fail to give notice of intent to rely on foreign law, pursuant to Maryland Code (2013 Repl.Vol.), Courts and Judicial Proceedings Article, § 10–504 (as was the case here), it is presumed that the relevant law in the foreign jurisdiction is the same as Maryland law.[11] The Court of Special Appeals observed that Noel did not preserve this argument for appellate review because he failed to raise it in the trial court. *Tshiani,* 208 Md.App. at 51 n. 6, 56 A.3d at 316 n. 6 (citing *Zellinger v. CRC Dev. Corp.,* 281 Md. 614, 380 A.2d 1064 (1977)). Although noting the intermediate appellate court's conclusion in his brief here, Noel offers to us no argument and cites no authorities to demonstrate that the conclusion was errant. In the absence of some showing of error, we will not afford Noel a second bite at the proverbial apple regarding the absence of any notice of intent to rely on foreign statutory or common law.

### B.

Second, Noel argues that "the trial court was not in a position to come to any conclusion regarding the validity of the foreign marriage." In support of this contention, Noel asserts that (1) the Court of Special Appeals applied improperly our opinions in *Redgrave v. Redgrave,* 38 Md. 93 (1873), and *Brell v. Brell,* 143 Md. 443, 122 A. 635 (1923), in upholding the trial court's finding of a valid marriage, (2) there was insufficient

---

11. In Noel's grand strategy, this foundational argument is a spring board to a contention that, because Maryland requires both parties to be present physically at a ceremony in Maryland for a valid marriage to exist, the Congolese ceremony was defective.

evidence to support the trial court's finding that a valid marriage occurred in the Congo, and (3) the trial court erred when it "permitted Marie–Louise, over objection, to testify regarding traditional marriage, yet [it] sustained an objection to Noel describing the essentials of such marriage." We consider those contentions, and Marie–Louise's counter-arguments, in turn.

## 1.

The parties disagree over the proper application of *Redgrave*. Noel contends that, under *Redgrave*, Marie–Louise failed to meet her burden of proving a valid Congolese marriage because she failed to adduce evidence, other than her own testimony, that the "traditional marriage" between her and Noel was recognized as valid under Congolese law. Noel grounds his argument on the following excerpt from *Redgrave*:

[H]aving assumed to prove that a valid marriage was celebrated on the particular occasion testified to by this witness, herself being a party to the transaction, it was incumbent upon him to show affirmatively that such marriage was in all respects in conformity to law; and, failing in this, he cannot be permitted to rely upon other facts and circumstances of the case as the ground of a presumption that a marriage may have taken place between the parties on some other and different occasion from that spoken of by the witness.

38 Md. at 98–99. Marie–Louise ripostes that Noel misreads *Redgrave*, which stands actually for the proposition that, where there is any competent evidence that a marriage occurred, the law presumes that the marriage was binding legally. She relies on the following other passage from *Redgrave:*

[T]he presumption is, that the marriage was duly and legally contracted according to the law of the place or country in which it occurred; and, when contracted in a foreign state or country, the validity of such marriage is recognized here, although it may not have been attended

with the same formal ceremonies as are required for the celebration of a valid marriage by the law of this State. 38 Md. at 98.

Superficially, the two passages from *Redgrave* appear to be at odds. On a closer reading of the opinion, however, it is revealed that, in context, the passage highlighted by Noel does not apply here. *Redgrave* involved a dispute between a decedent's widow and decedent's father over the decedent's estate. The father alleged that the widow's marriage to the deceased was invalid because, at the time of the marriage, the deceased was married already to another woman. *Redgrave*, 38 Md. at 94. The widow's testimony was not considered because she was deemed incompetent as a witness, pursuant to a statute in force at that time regarding testimony of parties to a contract in disputes with estate administrators. *Redgrave*, 38 Md. at 96. The Court did consider, however, the testimony of other witnesses indicating that a marriage ceremony occurred in a particular place, and that the parties moved later to another state, where they cohabitated, had children, held themselves out to be husband and wife, and were recognized as such by family members and others in their community. *Id.*

We concluded in *Redgrave* that the legality of a marriage is presumed "[w]here [the] parties live[d] together ostensibly as husband and wife, demean[ed] themselves towards each other as such, and [we]re received into society and treated by their friends and relations as having and being entitled to that status." 38 Md. at 97.[12] The Court of Special Appeals relied on this presumption in the present case. *Tshiani*, 208 Md. App. at 52, 56 A.3d at 317.

The passage from *Redgrave*, sheared from its mooring by Noel, referring to affirmative proof "that such marriage was in all respects in conformity to law," is offered bereft of context. In the flow of the opinion where it appears, we were reflecting

---

12. We reaffirmed later the presumption of marriage announced in *Redgrave*. *O'Leary v. Lawrence*, 138 Md. 147, 152, 113 A. 638, 640 (1921); *Richardson v. Smith*, 80 Md. 89, 93, 30 A. 568, 569 (1894).

on the decedent's father's attempt to rely solely on the testimony of a woman, who claimed that the deceased married her previously, whose reputation for bad character other witnesses attested to and whose testimony was contradicted by other evidence in the case. *Redgrave*, 38 Md. at 98–99. We refused to rely on her testimony, not merely because she was the sole witness of, and a party to, the marriage she alleged, but because her testimony was "discredited by the other facts and circumstances of the case" such that the contradictions were "too plain to escape observation." *Redgrave*, 38 Md. at 99.

The Court of Special Appeals did not err in its application of *Redgrave*. Marie–Louise's competence as a witness is not questioned on this record, nor, as the next section of our opinion reveals, is it plain that her testimony was contradicted sufficiently by other facts or circumstances in the case. Thus, the passage in which Noel finds succor is inapplicable here.

Similarly, we are not persuaded by Noel's argument that the intermediate appellate court erred in applying *Brell*. Noel argues that, because we were not asked to consider the facts surrounding the parties' wedding ceremony in *Brell*, that case is not applicable here. Noel's argument is misguided. Although *Brell* was not a case that turned on comity principles, and therefore did not concern whether the parties' marriage was one that would be recognized in Maryland, we concluded there that the wife's testimony that they were married in Germany, coupled with evidence of the parties later holding themselves out as husband and wife in the United States, was sufficient evidence of a legal marriage. 143 Md. at 448, 122 A. at 636. That conclusion is relevant to the determination in this case as to the adequacy of the proof of a valid marriage between Marie–Louise and Noel, and therefore the Court of Special Appeals did not err in relying on *Brell*.

### 2.

The evidentiary sufficiency challenge mounted by Noel concerns what type and quantum of evidence is necessary to raise the presumption of a legal marriage under *Redgrave*. Although the Court has not forged a bright-line rule in our prior

cases, we created general guidelines by which the sufficiency of evidence regarding the presumption of a legal marriage may be assessed. In *Redgrave*, we noted that "the most usual way of proving marriage . . . is by general reputation, cohabitation, and acknowledgement." 38 Md. at 97. Similarly, in *Barnum v. Barnum*, 42 Md. 251 (1875), we stated that marriage may be proved "by reputation, declarations and conduct of the parties." 42 Md. at 297. We concluded in *Barnum* that reputation evidence "must be founded on general, not divided or singular opinion," and that "the value of [declarations of the parties] as evidence will always depend upon the circumstances of the case." 42 Md. at 297–98.

We elaborated later regarding *Redgrave* and *Barnum*. In *Richardson v. Smith*, 80 Md. 89, 30 A. 568 (1894), decided when Maryland law still required a religious ceremony, we discussed the reasons why reputation, cohabitation, and acknowledgement may be sufficient to trigger a presumption of lawful marriage, even where more direct evidence may be lacking:

> In this state there cannot be a valid marriage without a religious ceremony, but a marriage may be competently proved without the testimony of witnesses who were at the ceremony. It would work very cruel injustices in many instances if the law were otherwise. The witnesses might be dead, and competent written evidence might be unattainable. It would not follow that the union between the parties would be considered illicit and the children illegitimate. The law has wisely provided that marriage may be proved by general reputation, cohabitation, and acknowledgement. When these exist, it will be inferred that a religious ceremony has taken place, and this proof will not be invalidated because evidence cannot be obtained of the time, place, and manner of the celebration of the marriage.

80 Md. at 93, 30 A. at 569. Elsewhere, we stated that cohabitation of the parties alone is insufficient to raise a presumption of marriage, where the relationship was "illicit in its commencement," but that marriage could be presumed where the parties have a child, cohabitate together, hold

themselves out as husband and wife, are treated as married in their community, and the woman takes the name of the man. *Jones v. Jones,* 45 Md. 144, 155–56 (1876), *overruled on other grounds by Kasten v. Kasten,* 159 Md. 329, 150 A. 854 (1930).

In this case, there was no reputation evidence, but there were declarations by Marie–Louise regarding the ceremony that took place in the Congo (then Zaire) in 1993 and the parties' relationship thereafter, as well as corroborative evidence concerning the conduct of the parties (including cohabitation, having children), and acknowledgement evidence. Regarding the Congolese ceremony, as noted previously, Marie–Louise testified that on 23 December 1993 she attended the ceremony in Kinshasa, along with members of her family and Noel's family. Noel, participating by telephone, confirmed that he wanted to be married to Marie–Louise and approved the delivery of a dowry to Marie–Louise's family, consisting of cash, clothes, food, and a live goat. She further testified that the families celebrated for several hours, and that she stayed then with a member of Noel's family, who facilitated her travel a few days later to join Noel in Virginia. Additionally, Marie–Louise maintained that the traditional ceremony she took part in was recognized as a marriage in the Congo, and that it did not deviate substantively from other traditional marriages she had attended there previously.

Marie–Louise also testified that during the following month, January 1994, she and Noel went to the Embassy of Zaire in Washington, D.C., to obtain official recognition of their Kinshasa marriage. They participated later in an additional religious (Roman Catholic) wedding ceremony in Virginia. The trial court admitted into evidence a certificate issued by the Virginia church confirming the ceremony in Virginia (not a wedding license). A document from the Embassy of the Congo was admitted, for the purpose of explaining the absence of a marriage license from the Kinshasa ceremony. That document stated that the Embassy provided previously documentation confirming the Kinshasa marriage, but no longer had the base records due to a flood at the Embassy. Additional evidence from the World Bank, Noel's employer, includ-

ed a letter from the Embassy of Zaire, dated 25 January 1994, that Noel used to obtain spousal benefits for Marie–Louise. Although the letter was in French, it corroborates (to some extent) Marie–Louise's testimony regarding the January 1994 visit to the Embassy of Zaire.

Additional testimony confirms that the couple lived together first in Virginia, and later in two different homes in Maryland, one of which was titled in Noel and Marie–Louise's names as "tenants by the entireties,"[13] and that Marie–Louise gave birth during the marriage to three children, whom the parties raised together. Furthermore, testimony at trial confirmed that Noel referred to Marie–Louise as his "wife" or "spouse" on his health and life insurance policies through his employer, on an application for her immigration legal residency papers, and for the purposes of filing state and federal tax returns.

Noel did not attempt to refute the cohabitation and acknowledgement evidence. He testified, however, that he did not take part in a ceremony in the Congo on 23 December 1993, by telephone or otherwise, and had no knowledge of any such ceremony. He testified also that he was never married legally to Marie–Louise. He explained his general and specific references to her as his wife on the basis that, in Congolese culture, people do that out of respect when a man and woman cohabitate and have children together. Unfortunately for Noel, the trial court found expressly that, as a general matter regarding his credibility at trial, Noel was "a liar and a manipulator," and that his testimony lacked credibility. The credibility of witnesses is a determination left to the trier of fact, and, on appellate review of a bench trial, we "give due regard to the opportunity of the trial court to judge the credibility of the witnesses." *Hill v. State,* 231 Md. 458, 462, 190 A.2d 795, 797 (1963); Md. Rule 8–131(c). Thus, we will not disturb the trial court's election, as the fact-finder in this case, to disregard Noel's testimony that was contrary to the testimony of Marie–Louise.

---

**13.** Titling real property as "tenants by the entireties" in Maryland is reserved for married couples.

We conclude that the trial court had before it sufficient evidence from which to find that a valid marriage occurred on 23 December 1993. It is fair to say that, ideally, more concrete and corroborative direct evidence of what occurred on that day in the Congo would be preferable, and that the confusing tactics of both parties, including flip-flopping as to which marriage ceremony to stand on and presenting incomplete evidence, has made somewhat murky what could have been a simpler case for the courts. Nevertheless, Noel's assertion that Marie–Louise failed to provide "necessary evidence," such as photographs of the event, a marriage license from the Congo, or testimony of other persons who attended the ceremony, is inconsistent with the longstanding minimum standards of the law of this State. In light of the available presumption of legal marriage discussed in *Redgrave*, and the cases shaping the contours of the types of evidence sufficient to establish that presumption, we agree with the Court of Special Appeals that the evidence adduced at trial formed a sufficient basis from which to presume that a valid marriage occurred in the Congo, as was persuaded so the trial judge.

Furthermore, we reject Noel's ancillary argument that the evidence produced by Marie–Louise was insufficient because she pleaded in her first Amended Complaint that a "civil ceremony" occurred in Kinshasa, but testified at trial that it was a "traditional marriage." The primary purpose behind our pleading standards is notice, *Ledvinka v. Ledvinka*, 154 Md.App. 420, 429, 840 A.2d 173, 178 (2003), and there need only be substantial agreement between what is pleaded and what is proved. *Duck v. Quality Custom Homes, Inc.*, 242 Md. 609, 613, 220 A.2d 143, 145 (1966). Marie–Louise's Amended Complaint put Noel on notice that she intended to prove that the parties were married legally in the Congo, and the difference in terminology between Marie–Louise's Amended Complaint and her testimony at trial is not the type of material variance between pleading and proof that would cause Noel to be surprised unfairly or otherwise prejudiced in trying this case.

**3.**

Noel next argues that the trial court was "clearly errone-
ous" in allowing Marie–Louise to testify, over objection, re-
garding the "traditional marriage" in the Congo and sustain-
ing subsequently an objection to Noel's efforts to offer his
"take" on the same subject during his direct examination.
The record does not support remotely Noel's assertions.

First, to contend that Marie–Louise was permitted to testify
"over objection" about the factual circumstances of the tradi-
tional marriage is specious.  The only objection during Marie–
Louise's testimony, regarding the traditional marriage, oc-
curred in the following colloquy during direct-examination by
her counsel:

Q   And is this, the marriage that you have just described,
is this the tradition of the Luba tribe?

A   Yes.

Q   Is this type of marriage recognized in Congo?

A   Yes.

[Noel's Trial Counsel] [14]: Objection.

The Court:  I'll hear you.

[Noel's Trial Counsel]:  When she said "type," I'm not
certain what the types are that we're referring to at this
point.

The Court:  Would you repeat your question, please?

[Marie–Louise's Counsel]:  Sure. Is this type of traditional
marriage recognized in Congo[?]

The Court:  Okay. Overruled.

[Marie–Louise's Counsel]:  You can answer.

A   Yes.

The apparent basis for the objection is that the question was
vague as to the "type" of marriage Marie–Louise's counsel
was referring to initially.  The trial judge overruled the
objection only after counsel rephrased her question to specify

---

**14.**   Noel's counsel before us was different than his trial counsel.

that she was referring to a "traditional" type of marriage. The objection did not concern the substantive admissibility of Marie–Louise's testimony on Congolese traditional marriages, nor did the court abuse its discretion by overruling a vagueness objection where counsel rephrased the question to be somewhat more specific.

Second, we find no merit in Noel's assertion that he was "prejudiced by not being permitted to testify" regarding his knowledge or impressions of traditional marriages in the Congo. Noel's only attempt to testify about his understanding of what constitutes a traditional marriage in the Congo occurred during direct examination by his trial counsel:

Q   Now, Mr. Tshiani, going back to the Congo ceremony, did you know that a ceremony was taking place on December 23, 1993?

A   No, I was very surprised to hear that on December 23rd, first of all, that's not how things happen in the Congo. I would like to describe how marriage, a traditional marriage is done.

[Marie–Louise's Counsel]: Objection.

The Court: Sustained.

Following the sustained objection, Noel's trial counsel diverted immediately to a different line of questioning, never to return to the subject of Noel's knowledge of, or views regarding, traditional Congolese marriages. In Maryland, litigants are permitted in civil actions to make general objections, without stating specific grounds, unless the court requests them. Md. Rule 2–517. The trial judge had available several grounds upon which to sustain the general objection by Marie–Louise's counsel. For example, Noel's announced desire to describe his understanding of traditional Congolese marriages was not responsive to the pending question asked by his counsel, and no foundation was laid to demonstrate Noel's personal knowledge of traditional Congolese marriages. Where Noel's trial counsel did not make other efforts to solicit relevant testimony on that subject, Noel was not "prejudiced" by the trial judge's ruling.

## *II.*

Marie–Louise proved that a valid marriage occurred in the Congo on 23 December 1993. We next consider whether that type of marriage, i.e. a marriage where the groom is not present physically, but participates by telephone, is one Maryland should recognize under the common law doctrine of comity.

■■ Where a valid foreign marriage occurred in another state or country, Maryland will recognize it as binding legally even if it would not have been binding legally if formed in Maryland. *Henderson v. Henderson,* 199 Md. 449, 458, 87 A.2d 403, 408 (1952). In the context of a marriage, we recognize two exceptions to the general rule of comity: (1) the type or circumstances of the marriage must not be prohibited expressly by Maryland's Legislature, and (2) the marriage cannot be repugnant to Maryland public policy. *Port v. Cowan,* 426 Md. 435, 444–45, 44 A.3d 970, 976 (2012) (citations omitted). Noel concedes that the "telephone marriage" at issue here is not prohibited expressly by the General Assembly. The only question before us then is whether such a marriage is repugnant to the public policy of this State.

■ We discussed recently the issue of repugnancy regarding recognition of a certain type of foreign marriage in *Port v. Cowan.* In that case, we recognized a same-sex marriage, performed validly under the laws of another state, for the purposes of granting a domestic divorce in Maryland at a time before Maryland recognized as legal such marriages entered in this State. In conducting a comity analysis, we could not "conclude logically that valid out-of-state same-sex marriages are 'repugnant' to Maryland public policy." *Port v. Cowan,* 426 Md. at 450–51, 44 A.3d at 980. Because the question in *Port v. Cowan* is analogous to the one here, and thus the same comity analysis applies, we need only briefly reiterate the pertinent legal principles discussed in that opinion. First, Maryland recognizes liberally marriages formed validly in foreign jurisdictions. 426 Md. at 445, 44 A.3d at 976. Second, although the issue of public policy is admittedly "an

amorphous legal concept," our prior decisions demonstrate that "[t]he bar in meeting the 'repugnancy' standard is set intentionally very high." 426 Md. at 449–50, 44 A.3d at 979. Third, we have recognized previously valid foreign marriages under the comity doctrine that would have been invalid if attempted to be formed in Maryland, including common law marriages and even a marriage between an uncle and a niece (at the time considered a misdemeanor punishable by fine if performed in this State). 426 Md. at 446, 44 A.3d at 976–77. Of note, "no still viable decision by this Court has deemed a valid foreign marriage to be 'repugnant,' despite being void or punishable as a misdemeanor or more serious crime were it performed in Maryland." 426 Md. at 455, 44 A.3d at 982.

Noel asserts no argument sufficient to convince us that the marriage by telephone conducted in the Congo is "repugnant" to Maryland's "public policy." Noel dedicates much of his brief to describing why a telephone marriage would not be valid if attempted in Maryland, and alleging a parade of horribles that would follow if we were to find that a foreign telephone marriage would be recognized in this State. Whether the marriage would be valid if performed here, however, is not the question. Noel fashions his arguments to us likely because the Court of Special Appeals noted, as part of its comity analysis, that, contrary to his arguments to that court, "no law suggests that proxy or phone marriages would not be permitted when performed in Maryland." *Tshiani,* 208 Md.App. at 58, 56 A.3d at 321. The Court of Special Appeals went on to discuss the issues of proxy marriages in other states and marriages accomplished by telephone, Skype, and other means. 208 Md.App. at 59–61, 56 A.3d at 321–23. We shall not weigh-in on that topic in deciding this case under a comity analysis. It is simply unnecessary to reach it. Thus, the validity of attempted telephone marriages formed in Maryland must await another day in court.

Noel's only argument directed at the relationship between the telephone aspect of the marriage in the Congo and repugnancy to the public policy of this State is his contention that a

telephone marriage "clearly goes against the solemnity of marriages." In light of our prior cases, we are not persuaded that his solemnity argument alone is sufficient to leap over the high bar of repugnancy. In *Port v. Cowan*, we recognized the valid out-of-state same-sex marriage despite language in Maryland's Family Law Article, in force at the time, declaring that "[o]nly a marriage between a man and a woman is valid in this State." 426 Md. at 447, 44 A.3d at 977. As discussed above, we recognized a valid out-of-state marriage between an uncle and a niece, despite the fact that such a marriage would be a misdemeanor offense if performed in Maryland. *Fensterwald v. Burk*, 129 Md. 131, 98 A. 358 (1916). In another case, we referred to the question of repugnancy as implicating a lack of "good morals." *See Holloway v. Safe Deposit & Trust Co. of Balt.*, 151 Md. 321, 134 A. 497, 501 (1926) ("[I]s such status so repugnant to good morals as to make its recognition improper?").

Although we refused to recognize a foreign divorce in *Aleem v. Aleem*, 404 Md. 404, 947 A.2d 489 (2008), on the ground that it was contrary to Maryland's public policy, we did so only after concluding that the ex parte nature of the divorce—the husband went alone to the Embassy of Pakistan in Washington, D.C., after a divorce action was filed here in Maryland by the wife, where he performed *talaq*, a procedure under Islamic religious and secular Pakistani law in which one obtains a divorce by reciting "I divorce thee" three times—was in conflict with Maryland statutes and deprived the wife of her constitutional rights.

We are not convinced that the circumstances of the telephone marriage in the Congo exceeds the unavailing level of dissonance with Maryland public policy found lacking in *Port v. Cowan* or *Fensterwald*, or that it meets the level of dissonance identified in *Aleem*. Because we decide this case in Marie–Louise's favor on comity grounds, we need not address the merits of the other arguments raised in her brief.[15]

---

**15.** Marie–Louise also argued that this Court should conclude, in the alternative, there was sufficient evidence to hold that the Tshianis

entered into a legally binding marriage in Virginia and that Noel should be precluded, under the doctrine of collateral estoppel, from arguing that they were never married legally.