Argued September 10, reversed and remanded November 4,
petition for rehearing denied December 15, 1964

# STATE OF OREGON *v.* ANDERSON

396 P. 2d 558

*Donald A. Bick,* Eugene, argued the cause for appellant. On the briefs were Bick & Monte, Eugene.

*William F. Frye,* District Attorney, Eugene, argued the cause for respondent. With him on the brief was Joseph J. Brown, Deputy District Attorney, Eugene.

Before MCALLISTER, Chief Justice, and ROSSMAN, PERRY, SLOAN, O'CONNELL, GOODWIN and DENECKE, Justices.

GOODWIN, J.

The question presented in this case is whether or not a proxy marriage celebrated in Oregon is valid in this state. Specifically, the purported husband seeks to invoke ORS 139.320 to exclude his spouse's testimony in a criminal trial.

The defendant was arrested and indicted for the crime of assault with intent to rob while armed with a dangerous weapon. He was unable to post bail and

remained in custody in the Eugene city jail during all times material to this case.

While the defendant was in custody, a marriage license, authorizing the marriage of defendant and Esther Lea Baker, was obtained. It goes without saying that if the defendant had been free on bail he would have been able to marry his friend without delay. He was not allowed a sufficient number of visitors to enable the ceremony to be read in the jail.

Defendant executed a power of attorney giving one Walter Haag authority as defendant's representative to appear before a judge or minister duly authorized to perform a marriage ceremony, and to consent in the presence of that official and two witnesses to take Esther Lea Baker as his lawful wife. The power of attorney stated that this power was given because of the defendant's love for Esther Lea Baker, and to give the child which she was then expecting a name.

In due course the bride, with Mr. Haag and two witnesses, appeared before a Justice of the Peace, and a ceremony was performed. Mr. Haag, as defendant's agent, gave the defendant's consent to the marriage at the proper place in the ceremony.

Upon the defendant's subsequent trial for armed robbery, the state caused Esther Lea Baker to be sworn as a witness. The defendant invoked the marital privilege as provided in ORS 139.320. The court refused to recognize the marriage and ordered Esther Lea Baker to testify. She thereupon testified to facts material to the case of the state of Oregon. The jury returned a verdict of guilty. The defendant now appeals from the resulting judgment.

ORS 139.320 states:

"In all criminal actions in which the husband is the party accused, the wife is a competent wit-

ness and when the wife is the party accused, the husband is a competent witness; but neither husband nor wife in such cases shall be compelled or allowed to testify in such case unless by consent of both of them * * *."

If the witness was the defendant's wife, the defendant was entitled to assert the privilege of ORS 139.320, even though he married the witness after the crime had occurred and after he had been jailed. As Professor Wigmore has observed:

"Again, as the innocent unmarried are not deemed to deserve the benefit of the rule, so too, conversely, its benefits are gained by the ingenious wrongdoer who brings himself within its formal terms by marrying the witness even *after service of subpoena* and thus creating ad hoc a domestic peace which is to be jealously safeguarded * * *." 8 Wigmore, Evidence 224, § 2230 (McNaughton rev 1961). See also cases in footnote 4 on page 224 and *State v. McGinty,* 14 Wash2d 71, 126 P2d 1086 (1942).

The problem in this case is not whether proxy marriages are good or bad, but whether they are utterly void. In a more narrow sense, the question is whether a defect in the marriage ceremony arising out of the representation of an absent party by a proxy, assuming that it is a defect, is of a character that will render the marriage void, or merely voidable at the suit of one of the parties.

■ In 1925, this court declared that the Oregon statutes relative to the manner of contracting marriage had entirely superseded common-law rules. *Huard v. McTeigh,* 113 Or 279, 295, 232 P 658, 39 ALR 528 (1925). Accordingly, a proxy marriage cannot be sustained as a common-law marriage in this state.

ORS 106.150 deals with the form of solemnization necessary to constitute a valid marriage:

> "(1) In the solemnization of a marriage no particular form is required except that the parties thereto shall assent or declare in the presence of the minister or judicial officer solemnizing the marriage and in the presence of at least two witnesses, that they take each other to be husband and wife * * *."

Since ORS 106.150 describes the exclusive method by which marriages may be solemnized in this state, we may assume, without deciding, that the act of a proxy will not satisfy the requirement that the parties to the marriage shall "assent or declare" in the presence of the officer solemnizing the marriage. However, if the ceremonial declaration made by an agent is a defect, does it necessarily render the entire proceeding void?

ORS 106.150 does not expresssly provide for assent to be given by an agent. Neither does it expressly proscribe it. The respondent argues that if the legislature had intended to provide for assent to be given by one or more agents it would have been a simple matter to include such language in the statute. The defendant, on the other hand, contends that there is nothing objectionable, per se, about an agent binding his principal at the marriage altar.[1] He denies that

---

[1] Proxy marriage first appears in Western European records with the marriage of Clovis of France to Clotilde in the year 496 A.D. It was, for centuries, a popular method of serving royal interests while avoiding the hazards of travel. Proxy marriage enabled kings to win subjects and gain empires without leaving their castles. Among the more notable proxy marriages recorded in Europe were those of Queen Mary of England and Philip II of Spain, and of Emperor Maximilian I to Annede Bretagne and later to Bianca Sforza. Balboa and Columbus both acquired wives in this manner. Howery, *Marriage by Proxy and Other Informal*

there is any defect in a proxy marriage, but asserts that if there is one it is not of sufficient gravity to render the marriage itself void.

■ A proxy marriage differs from the more conventional ceremony only in that one or both of the contracting parties may be represented by an agent. All the other requirements, such as license, medical examination, the ceremonial exchange of vows before witnesses, and recordation, prescribed by the particular jurisdiction must be met. Note, 21 So Calif L Rev 206 (1948).

The defendant's position is supported by the decision in *Barrons v. United States,* 191 F2d 92 (9th Cir 1951). In that case, a soldier, who was absent in military service, had authorized a proxy on his behalf to marry a woman in a ceremony in Nevada. The marriage statute in Nevada (NRS 122.110) was virtually identical to ORS 106.150. The requirements of Nevada law were fully met except that the groom was represented by proxy. In a contest over the proceeds of national service life insurance, the marriage was held valid under Nevada law.

■ The Ninth Circuit Court held that the defect, if any, in a ceremony in which the assent of a party was given by proxy was not a defect of the character

*Marriages,* 13 U Kan City L Rev 48, 50 (1944-45); Comment, 25 So Calif L Rev 181 (1952). Holbein's painting shows the reaction of Henry VIII when he met Anne of Cleves and fled at his first sight of her. That unhappy union not only had been celebrated at a proxy ceremony, but the bride had been selected, wooed, and more or less won by a proctorial representative. In modern times, proxy marriage has been approved in Ex parte Suzanna, 295 F 713 (D Mass 1924), where the court expressed the egalitarian sentiment that if royalty could do it, "why may not those of more common clay * * *?" 295 F at 716. For a recent discussion of the attitude of the various American jurisdictions toward proxy marriage, see Moore, *The Case for Marriage by Proxy,* 11 Cleveland-Marshall L Rev 313 (1962).

that would render the marriage void. (The court relied in part upon other Nevada statutes which, like that of Oregon, ORS 106.020, enumerate such obstacles to marriage as bigamy and incest, either of which makes a marriage void.) The court found that any defect in the solemnization of the Nevada marriage by proxy would only make the marriage voidable. Consequently, the validity of the marriage could not be raised in a collateral attack. We agree with the result in *Barrons v. United States.*

There is nothing about a proxy marriage that appears to be contrary to public policy. Indeed, the difficulties involved in the appointment of a proxy as compared to the relative ease with which parties may exchange vows in person in this state would suggest that there is no great danger of mischief resulting from the employment of a proxy. In rare cases, the use of a proxy may be the only way in which a desirable legal and social status can be achieved.

■ The most often voiced objection to proxy marriages is that unbeknownst to the celebrants the power of attorney may have been revoked prior to the celebration of the marriage. See Lorenzen, *Marriage by Proxy and The Conflict of Laws,* 32 Harv L Rev 473 (1919). With the many accurate and prompt modern methods of communication available, the possibility of a failure to communicate revocation is extremely slight. Comment, 25 So Calif L Rev 181, 183 (1952); *Barrons v. United States,* supra at 97. If in a particular case it could be proved that the authority of a proxy had been revoked, that fact would, in a direct attack upon the marriage, be a ground for declaring the marriage voidable and annulling it.

■ Regardless of the strength or weakness of the equities in a particular case, this court should not

declare void a particular proxy marriage unless the same rule would be applicable in all cases of proxy marriage. See *Huard v. McTeigh,* 113 Or, supra, at 289-290, for the desirability of certainty in such matters.

■■ A marriage that is not void, even if it may be voidable, is deemed to be valid until it is duly declared to be otherwise. It is not subject to attack by third parties. *Dibble v. Meyer,* 203 Or 541, 546, 278 P2d 901, 280 P2d 765 (1955). Upon a prima facie showing of marriage, either spouse is entitled to the benefits of ORS 139.320.

As its second line of resistance to the marriage in this case, the state contends that the defendant was a parole violator and consequently a person whose civil rights had been duly suspended under the provisions of ORS 137.250 (2). That section provides that upon revocation of probation or parole and commitment to a penal institution, civil rights are suspended. Because the defendant had not yet been received at the penitentiary either as a parole violator or as a convicted person sentenced for a new offense, we need not decide now whether the statute effectively denies a person who falls within its terms the right to enter into a contract of marriage. Accordingly, it is immaterial that the defendant was conceded to be a parole violator. Further, since the loss of civil rights as a convicted felon goes to the capacity of the person to marry, and is not one of the statutory grounds for declaring a marriage to be void, a want of capacity to marry, if it were shown, might make the marriage voidable at the suit of a party to the marriage, but it would not necessarily make it void.

Because of the error in denying the defendant the right conferred upon him by ORS 139.320 to exclude

the testimony of the witness in question, the cause must be remanded for another trial without the testimony of the defendant's wife.

Reversed and remanded.

McALLISTER, C. J., dissenting.

In my opinion the provisions of ORS 106.150 (1)① that the parties to a marriage "shall assent or declare *in the presence of* the minister or judical officer solemnizing the marriage and *in the presence of* at least two witnesses, that they take each other to be husband and wife" are mandatory and require the parties to the marriage to attend and participate in the ceremony in person. ORS 106.150 was enacted in 1862 and compiled as section 5, ch 31, of the Deady Code. As far as I am aware the statute has been construed since its enactment to require parties to a marriage to personally attend and participate in the ceremony. In an opinion written by Judge Deady in 1870 he said:

> "The consent to become husband and wife—the contract out of which arises the relation—must be given as herein prescribed—before a person authorized to solemnize marriage, and in the presence of two witnesses. Without the observance of these formalities, the marriage relation, it seems to me, cannot be created within the States of Oregon and California, particularly the former. Neither ought it to be. * * *" *Holmes v. Holmes,* 1 Sawy. 99, 116, 1 Abb (US) 525, 12 Fed Cas 405 (No. 6,638).

---

① ORS 106.150. "(1) In the solemnization of a marriage no particular form is required except that the parties thereto shall assent or declare in the presence of the minister or judicial officer solemnizing the marriage and in the presence of at least two witnesses, that they take each other to be husband and wife."

See also, *State v. Wakefield,* 111 Or 615, 631, 632, 228 P 115 (1924) and 1942-44 AG 319.

The majority concedes that in case of a direct at-tack by one of the parties ORS 106.150 (1) must be construed to prohibit proxy marriages. The opinion of the majority is based on the premise that the failure of one or both of the parties to "assent or declare" in the presence of the officer solemnizing the marriage is merely a defect which does not necessarily render the entire proceeding void. In this I think the court errs. In my opinion the failure of both parties to appear in person and to "assent or declare" in the presence of the officer solemnizing the marriage and in the pres-ence of at least two witnesses results in a non-mar-riage. As said by Judge Deady, a marriage cannot be "created" in Oregon "without the observance of these formalities."

The statutes ORS 106.020 and 106.030, on which the majority relies, are not relevant in this case. They provide that certain marriages between parties under disability, or where consent is obtained by force or fraud, are either void or voidable. Both statutes, how-ever, contemplate that a marriage ceremony in com-pliance with ORS 106.150 has been solemnized. Neither statute indicates the consequences of a failure to solemnize a marriage as required by ORS 106.150. Here, as the majority recognizes, no marriage has been solemnized in compliance with ORS 106.150. The majority opinion merely adds to the voidable mar-riages listed in ORS 106.030 a further class, namely: marriages in which either one or both of the parties are not personally present as required by law.

It should be pointed out that the only ground upon which one of the parties to a proxy marriage could attack its validity is that the statute does not authorize

a proxy marriage. If, as the majority tacitly concedes, the statute should be so construed, it is difficult to understand how the court can elevate, even to a "voidable" statute a ceremony failing completely to comply with ORS 106.150. This is not a case of a defective marriage, it is a case of no marriage at all.

If there is to be any relaxation of the formalities required to consummate a valid marriage, the change should be made by the legislature and not by this court. We have no right to indulge in judicial legislation merely because some of the court feel that "there is no great danger of mischief resulting from" proxy marriages, and that a proxy marriage does not appear to be "contrary to public policy."

Perry, J., joins in this dissent.

ROSSMAN, J., dissenting.

ORS 106.150 (1), which defines the manner in which marriage shall be solemnized, says:

> "In the solemnization of a marriage no particular form is required except that the parties thereto shall assent or declare in the presence of the minister or judicial officer solemnizing the marriage and in the presence of at least two witnesses, that they take each other to be husband and wife."

The words just quoted, in stating that "the parties thereto shall assent or declare in the presence of the minister or judicial officer * * * and in the presence of at least two witnesses" that they take each other to be husband and wife plainly requires that the parties, that is, both of them, must be in the presence of the minister or judicial officer and that of the witnesses when the marriage is solemnized. To place upon those words any other meaning would not be a construction

of them but a dispensation with their plain and unambiguous meaning. If one can be absent from his wedding, both can be absent.

Our present statute which prescribes the manner of solemnizing marriages has remained unchanged in Oregon for more than a century of time. Proxy marriages have been viewed as novelties and as foreigners to our practice and customs. Now the majority gives them the status of natives. Lord Francis Bacon, former Lord Chancellor of England, said:

> "Judges ought to remember that their office is 'jus dicere,' and not 'jus dare;' to interpret law, and not to make law, or give law * * *. 'Cursed (with the law) is he that removeth the landmark.' The mislayer of a mere stone is to blame; but it is the unjust judge that is the capital remover of landmarks, when he defineth amiss of lands and property. One foul sentence doth more hurt than many foul examples; for these do but corrupt the stream, the other corrupteth the fountain * * *."

The new conception of the solemnization of marriages today introduced by the majority lessens the beauty and solemnity of one of civilization's most honored institutions. That institution is the very foundation of the state and of all culture.

There is a very practical reason for requiring the bride and groom to be present when the service is performed—it assures the minister or judicial officer of their identity and of their understanding of the service.

I dissent.