In re William E. BLANKENSHIP, Debtor.

Bruce C. FRENCH, Trustee, Plaintiff,

v.

William E. BLANKENSHIP, Defendant.

Bankruptcy No. 89–0298.
Related Case: 89–01837.

United States Bankruptcy Court,
N.D. Ohio, W.D.

June 24, 1991.

L. Mari Taoka, Toledo, Ohio, for plaintiff.

Frank I. Zygela, Toledo, Ohio, for William Blankenship.

John F. Kostyo, Findlay, Ohio, for Maxine Blankenship.

Dale R. Crandall, Perrysburg, Ohio, for Mary Ellis.

## MEMORANDUM OPINION AND ORDER

RICHARD L. SPEER, Bankruptcy Judge.

This cause comes before the Court upon Plaintiff's Complaint for Turnover of Assets and for Denial of Discharge. A Trial was held at which time the parties had the opportunity to present the evidence and arguments they wished the Court to consider in reaching its decision. The Court has reviewed the testimony, the documents admitted at Trial, the arguments of counsel, as well as the entire record in this case. Based upon that review, and for the following reasons, the Court finds that the Debtor should turn over the assets in question and that the Debtor's discharge should be denied.

## FACTS

On June 29, 1989, William Earl Blankenship (hereinafter "Blankenship"), Defendant/Debtor, filed for protection under Chapter 7 of the Bankruptcy Code. Soon after the petition was filed, the following events were unearthed which resulted in the filing of the Complaint for Turnover of Assets and Denial of Discharge by Plaintiff/Trustee, Bruce C. French. The Trustee employed Mari Taoka (hereinafter "Taoka") to represent him in this matter.

In the Complaint against the Debtor, Maxine Hancock (hereinafter "Hancock"), Lloyd Smith, and Mary LaGore, the Trustee listed several items which were believed to be property of the estate, and as such, should have been turned over to the estate. Those items included (1) three parcels of real estate identified as 28 North Main Street, Dunkirk, Ohio; 130 West Walnut Street, Dunkirk, Ohio; and Inlot 28, Packer's Eastern Addition, Dunkirk, Ohio; (2) money in the amount of Nine Thousand Three Hundred Twenty-two Dollars and Ninety-five Cents ($9,322.95) from Mr. Smith and Ms. LaGore; (3) money in the amount of Four Thousand Dollars ($4,000.00) from Hancock; (4) stock certificates; (5) life insurance policy; (6) rental receipts from 283 North Main Street, Dunkirk, Ohio; and (7) money transferred to the Debtor's son prior to filing the petition. After initial discovery, the Trustee dismissed the action against Mr. Smith and Ms. LaGore because the Trustee determined that they did not have any assets of the estate in their possession. That dismissal also involved the property located at 28 North Main Street, Dunkirk, Ohio.

## LAW

The Trustee brought this action for turnover of assets and for denial of Discharge. Section 542 of the Bankruptcy Code provides that:

an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property of the value of such property, unless such property is of inconsequential value or benefit to the estate.

11 U.S.C. § 542 (1989).

At a pre-trial conference, a dispute arose as to the Debtor's marital status. The Debtor denied the Trustee's allegations that he was married to Hancock. Therefore, a threshold issue which this Court must address is whether Blankenship and Hancock are, or ever were, married. Despite Blankenship's protests to the contrary, this Court believes that Blankenship and Hancock are married.

■ Because the power to regulate domestic relations belongs to the state, the Court must look to state law to determine the marital status of Blankenship and Hancock. *Butner v. United States*, 440 U.S. 48, 55–57, 99 S.Ct. 914, 918–19, 59 L.Ed.2d 136 (1979).

■ In Ohio, persons wishing to marry must apply for a license and then, once the application is approved, have the marriage solemnized. *See*, O.R.C. § 3101.01, et seq. (Baldwin 1988). Generally, there is a five (5) day waiting period between application and issuance of the marriage license. This can be waived by the Probate Judge. O.R.C. § 3101.05 (Baldwin 1988). Ohio does not authorize the performance of proxy marriages due to the statutory requirements of personal presence of the parties at the ceremony, although it will recognize proxy marriages when performed in a state where such marriages are valid. *Hardin v. Davis*, 30 Ohio Op. 524, 16 Ohio Supp. 19 (1945).

■ When the validity of a marriage is questioned, factors other than statutory compliance may be considered. One such factor is cohabitation. In *Lester v. Lester*, the court held that "cohabitation means the act of living together" and that "cohabitation can be based entirely on acts of living together without sexual relations." *Lester v. Lester*, 1981 WL 3186 page 1 (Franklin County Court of Appeals, May 14, 1981). A review of Hancock's interrogatories filed with the Court reflects that

she resided at 130 South Walnut Street, Dunkirk, Ohio, and that she admitted that she cohabitated with Blankenship and shared expenses with Blankenship. However, she denied being married to him when such a question was posed in the interrogatories. Blankenship's pre-trial memorandum filed with the Court reflects that he resided with Hancock at 130 South Walnut Street, Dunkirk, Ohio. Based upon all the evidence, the Court believes that Blankenship and Hancock live together and are married.

Further evidence upon which the Court relies in making this finding include the fact that Blankenship named Hancock as his primary beneficiary on his life insurance policy with Western–Southern Life. The policy date was March 1, 1985, and Hancock was listed as Blankenship's wife. On, or about, February 13, 1987, Blankenship filed with Western–Southern a notice of change of beneficiary to include his daughter as a secondary beneficiary. He retained Hancock as his primary beneficiary without changing her relationship as his wife.

The Court also takes note of the fact that Blankenship and Hancock had a joint checking account. One exhibit to Hancock's pre-trial statement filed with the Court is a copy of a check reflecting both Blankenship and Hancock as named drawers on the account.

Additional evidence is the deed dated September 23, 1988, conveying real estate known as Inlot 28, Packer's Eastern Addition in Dunkirk to Blankenship and Hancock as husband and wife. At the trial, Blankenship testified that this transfer was a mistake on the part of the grantor. Blankenship also testified that he attempted to rectify the situation by transferring his portion of the parcel to Hancock on April 13, 1989. The Court places little credence in this story as Blankenship signed the deed without reference to the fact that he was not Hancock's husband. Additionally, his transfer to Hancock occurred approximately seven (7) months after the original deed was executed and two months before his Bankruptcy petition was filed.

At trial, the Debtor testified that he wanted to protect Hancock from her children who were threatening to place her in a mental institution and that he thought that if he married Hancock, he would prevent such actions by her children. Blankenship testified that on or about January 14, 1985, he, Hancock, and Kathryn Robinson, a friend, went to Marion, Ohio, so that Blankenship and Hancock could be married. The Defendant/Debtor admitted that both he and Ms. Robinson had been drinking heavily and that Hancock was under the influence of drugs prescribed for her mental health. Blankenship testified that Hancock volunteered the information needed and signed the marriage application. Both Blankenship and Hancock signed an oath that they were not under the influence of any intoxicating liquor or controlled substance, despite the Debtor's testimony to the contrary. However, Blankenship further testified that it was Ms. Robinson who stood and took the vows before the minister solemnizing the marriage and that Ms. Robinson did not reveal to the minister her true identity. Blankenship asserts that he did not marry Hancock because she was not physically present and did not take the vows before the minister. The Court is chagrinned at the fact that Blankenship would take such steps to defraud another court. The Court places little weight on the Debtor's contentions and accordingly makes the finding that Blankenship and Hancock are married.

 As Bankruptcy courts are primarily courts of equity, this Court can rely on the equitable remedy of estoppel to further buttress its position of the Debtor's marital status. Blankenship intended to marry Hancock and she consented as indicated by her application for marriage. Hancock knew of the marriage ceremony and yet, years later, has done nothing to nullify its effects. Essentially, she ratified the marriage by her conduct. Therefore, both Blankenship and Hancock are estopped from denying their marriage.

The Debtor failed to present any evidence that he and Hancock resided together for purely economical purposes. The

Court notes that no evidence was presented to indicate that a divorce was had and therefore Blankenship and Hancock are still married. [For continuity, the Court will continue to refer to the Debtor's wife as Hancock.]

Finding that Blankenship and Hancock are married, the Court now turns its attention to the various transfers between the couple. The Trustee requests a turn-over of all real estate transferred between them which are not in the statutory guidelines of Section 547(b) of the Bankruptcy Code. That Section deals with preferential transfers and provides, in pertinent part, that:

(b) the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of the transfer was an insider; and

(5) that enable such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b). Hancock qualifies as an insider as she is the Debtor's wife. *See* 11 U.S.C. § 101(30)(A)(i). The trustee has the burden of proof in an allegation of preferential transfer. *See* 11 U.S.C. § 547(g).

On, or about, April 18, 1989, the Debtor transferred to Hancock a parcel of real estate identified as 130 West Walnut Street, Dunkirk, Ohio. This transfer was made without consideration on behalf of Hancock. At trial, the Debtor testified that this transfer was made in lieu of a monetary obligation which the Debtor owed to Hancock's former husband. The Court finds that the real estate transfer of 130 West Walnut Street to Hancock was one on account of an antecedent debt and as such can be avoided under Section 547(b).

The Trustee seeks to avoid the transfer of real estate known as Inlot 28, Packer's Eastern Addition, Dunkirk, Ohio. As discussed earlier, this parcel was conveyed to both Blankenship and Hancock on September 23, 1988. On April 13, 1989, two months prior to bankruptcy, Blankenship transferred his interest to Hancock. The Court holds that this transfer cannot be avoided as the Trustee presented no evidence that this was done with the intent to defraud Blankenship's creditors.

The Trustee requested the turn-over of Four Thousand Dollars ($4,000.00) which was given to Hancock by the Debtor within one year of bankruptcy. At trial, the Debtor testified that the transfer of the Four Thousand Dollars ($4,000.00) was made so that Hancock could purchase the B & M Bar and Grill located at 283 North Main Street, Dunkirk, Ohio. The Debtor denied that the money was a gift. The Court also finds that the money should be turned over as a constructive trust was created when Blankenship transferred money to his wife for the purpose of obtaining an interest in the B & M Bar and Grill. Since the Debtor denied that the money was a gift and yet offered no positive evidence that valuable consideration was given in exchange, the money can be declared as being in a constructive trust for the benefit of the Debtor. *Second National Bank of Greenville v. Hoblit*, 41 Ohio App. 126, 11 Ohio L. Abs 458, 179 N.E. 812 (Darke Co.1931). Since the trust is for the benefit of the Debtor, the Court finds that the money is to be turned over to the estate for distribution as it is property of the estate. *See* 11 U.S.C. § 541. Blankenship obtained an interest in the B & M Bar and Grill as indicated by his name being on the savings account signature card. The signature card reflects that the account was opened on May 12, 1986.

At Trial, Blankenship testified that he made a deposit, consisting of his own money, of Ten Thousand Dollars ($10,000.00) into the B & M Bar and Grill account on March 12, 1989. Despite this admission, Blankenship testified that he did not include the B & M Bar and Grill savings account on his petition because he believed that the money in the account was not his. Blankenship's belief is not well founded and this Court frowns upon those debtors who knowingly fail to fully disclose assets to the Bankruptcy Court. From Blankenship's testimony, it appears that he attempted to do just that. Accordingly, the Court holds that Blankenship must turnover his interest in the B & M Bar and Grill to the Trustee.

The next issue with which the Court is faced is Blankenship's interest in the Checkered Lounge, Co., Inc., located as 297 North Main Street, Dunkirk, Ohio. The Debtor's amended B–2 Schedules reflected that he owned no stocks, bonds, nor any interest in any corporation or partnership. However, at Trial, the Trustee entered into evidence a set of documents from the Ohio Department of Liquor Control which reflect Blankenship's ownership interest: (1) a certification from the Director of the Ohio Department of Liquor Control that as of March 7, 1990, departmental records indicate the owner and sole stockholder of Checkered Lounge Co., Inc., to be William Blankenship; (2) a corporation/stock data verification card reflecting that William Blankenship was issued One Hundred (100) Shares of stock on the Checkered Lounge Co., Inc.; (3) a letter of November 14, 1986, from Gary L. Ufferman, Supervisor of the Permit Division of the Ohio Department of Liquor Control, reflecting that William Blankenship owns 100 shares of stock in the Checkered Lounge Co., Inc.; (4) an agreement of sale of One Hundred (100) Shares of stock in the Checkered Lounge Co., Inc. dated July 26, 1983, to which William Blankenship signed as a guarantor; and (5) an amendment to the agreement of sale, dated September 30, 1985, in which William Blankenship became the principal buyer of One Hundred (100) Shares of stock in the Checkered Lounge Co., Inc.

When asked about the ownership, the Debtor testified that he has no ownership interest in the Checkered Lounge · Co., Inc. Upon further questioning, however, he recanted and testified that he owns One Hundred Dollars ($100.00) of stock and *not* One Hundred (100) Shares of stock. He testified that the corporation/stock verification card reflects that he was "present manager" and not "manager president" as it purports to say. (See Exhibit "A") The Debtor testified that he was a guarantor on the sale of the shares; but he would not explain the document wherein he was identified as the *buyer* of the shares of stock. When asked about the Checkered Lounge Co., Inc. checking account, the following transpired:

> Ms. Taoka: In fact, weren't you a signatory on the account at the Checkered Lounge?
>
> Debtor: Yes, ma'am, I was.
>
> Ms. Taoka: And didn't you have the majority of control over the checking account for the Checkered Lounge?
>
> Debtor: Yes, ma'am, I did.
>
> Ms. Taoka: Why was that interest not disclosed on your bankruptcy petition?
>
> Debtor: Checkered Lounge wasn't being questioned there, it was W.E. Blankenship being questioned, the discrepancy of the Checkered Lounge wasn't up there.

Trial Transcript p. 33. An interesting twist occurred when Blankenship testified that he had tried to sell the Checkered Lounge. Ms. Taoka then asked how he could sell the Checkered Lounge if he had no ownership interest. The Debtor did not have an answer. The Court, based upon all of the evidence, finds that the Debtor owns One Hundred (100) Shares of stock in the Checkered Lounge Co., Inc. and that said stock should be turned over to the Trustee for proper distribution.

The Trustee requested a turn-over of rents received from June James in connection with the Debtor's rental property located at 283 North Main Street, Dunkirk, Ohio. When asked about this income, the Debtor testified that he had not received any rental income from this property. He

testified that he had the right to receive such income, but never collected it. The Trustee was unable to present evidence that such income was collected. Therefore, the Court must deny the Trustee's request.

At Trial, facts were divulged that Blankenship gave Eight Thousand Dollars ($8,000.00) to his son subsequent to March 30, 1989, which was not disclosed in his petition. Furthermore, the Debtor testified that he took a vacation with his son and that during this time he gambled away money "on horses, and cards, and fast women." Trial Transcript p. 57. He testified that he suffered an Eighteen Thousand Dollar ($18,000.00) loss due to gambling within three months prior to filing for bankruptcy. This loss was not included on his petition, either. Accordingly, this Court finds that the transfer to the Debtor's son should be turned over to the estate, and that the Debtor's petition should be amended to include the gambling loss.

Testimony revealed that the Debtor had a safe deposit box at the Village Bank in Dunkirk, Ohio, which was not listed on his petition. Mr. Blankenship testified that he had the box at the time of filing, and that the box contained, "[s]ilver coins, silverhead dimes and [coins] such as that." Trial Transcript p. 90. When asked why the box was not disclosed, the following question and answer resulted:

Trial Transcript, p. 91.

> Ms. Taoka: Mr. Blankenship, why was that safe deposit box ... not disclosed on your bankruptcy petition?
>
> Debtor: Well, that's a good question, I didn't figure there was enough in it to even fool with.
>
> Ms. Taoka: Mr. Blankenship, why were the coins not disclosed on your B–2 schedules?
>
> Debtor: Well, you want them, you can have them, I'll give you the key to go and get them.
>
> Ms. Taoka: Mr. Blankenship, that is not my question, why were these coins and safe deposit boxes—
>
> Debtor: Because they weren't of any great value as far as I'm concerned, they were more or less keepsakes.

> Ms. Taoka: Because they were not of any value as far as you were concerned, you didn't feel an obligation to disclose them in your bankruptcy petition?
>
> Debtor: No, no, I didn't.

Trial Transcript, p. 91.

During Trial, Ms. Taoka noticed that the Debtor was wearing two rings and inquired as to their existence. Blankenship testified that he had both rings at the time of filing his petition, but had no justifiable explanation as to why they weren't included in his petition. The Court holds that these rings should be turned over to the Trustee.

■ This Court is distressed at Blankenship's obvious efforts to misconstrue or narrowly construe facts in a light most favorable to him in his efforts to obtain relief from his debts. At Trial, Blankenship testified as to various assets and facts that he had not included on his Bankruptcy petition, for whatever reasons. The Debtor blamed his former attorney for not including these assets, contending that he had disclosed all to his former attorney. The Court questions that Blankenship disclosed all to his former attorney as he was continually evasive to Ms. Taoka's questioning, viewed situations in an illogical manner, and was not even honest with the Court during Trial. From his testimony, Blankenship has a background for business, and yet continually claimed ignorance as to legal proceedings. The Court notes for the record that Blankenship had filed for Bankruptcy protection in 1963 and thus should know what is involved in filing for Bankruptcy.

The Court does not believe that Blankenship is an honest debtor to which the Code was enacted to protect. His failure to include assets is a blatant attack on the Bankruptcy system. Bankruptcy is based upon forgiveness rather than retribution, but with forgiveness comes the duty of following rules. One of the rules is to list *all* debts and assets, not just the ones the petitioner decides are important. This rule effectuates the fresh start policy; but, if all the assets are not listed, the debtor

receives *more* than a "fresh start." Thus, the Bankruptcy system becomes a farce.

In judging the credibility of the Debtor and the weight given to his testimony, this Court has taken into consideration the Debtor's intelligence, age, memory, his demeanor while testifying, the reasonableness of his testimony in light of all the evidence of the case, and any interest, bias, or prejudice he may have. In reaching the conclusions found in this Opinion, the Court has considered all the evidence and arguments of counsel, regardless of whether or not they are specifically referred to in this Opinion.

Accordingly, it is

ORDERED that the Debtor turn over to the Trustee for proper distribution, the following:

1. The Four Thousand Dollars ($4,000.00) transferred to Hancock;

2. The stock certificates evidencing the One Hundred (100) Shares of stock in the Checkered Lounge Co., Inc., as well as any other interest he may have therein;

3. The safe deposit box, as well as the contents therein;

4. The rings which were not listed on the petition;

5. The parcel of real estate known as 130 West Walnut Street, Dunkirk, Ohio;

6. The Eight Thousand Dollars ($8,000.00) given to his son.

It is FURTHER ORDERED that the Debtor amend his petition to include the Eighteen Thousand Dollar ($18,000.00) loss due to gambling.

It is FURTHER ORDERED that the Debtor's Discharge be, and is hereby, DENIED.