56 A.3d 311

Noel TSHIANI

v.

Marie–Louise TSHIANI.

No. 2655, Sept. Term, 2010.

Court of Special Appeals of Maryland.

Nov. 21, 2012.

46

Eugene L. Souder, Jr. (Wampler & Souder, LLC, on the brief) Frederick, MD, for appellant.

Judith A. Wolfer (House of Ruth, MD, Domestic Violence Legal Clinic, on the brief) Baltimore, MD, for appellee.

Panel: KRAUSER, C.J., ZARNOCH, and BERGER, JJ.

ZARNOCH, J.

### STATEMENT OF THE CASE

In this case, we have been asked to invalidate an allegedly impermissible "proxy" marriage that had lasted more than eighteen years. This appeal comes to us from the Circuit Court for Montgomery County, where the circuit judge granted appellee Marie–Louise Tshiani's ("Marie–Louise") request for absolute divorce, alimony, property division, child support, and attorney's fees. Appellant Noel Tshiani ("Noel") contends that there can be no divorce and no monetary award because the parties' marriage in the Democratic Republic of Congo is

not valid under Maryland law. We reject this contention and affirm the judgment of absolute divorce.

## FACTS AND LEGAL PROCEEDINGS

Both parties are natives of Kinshasa, Democratic Republic of Congo (formerly Zaire). Marie–Louise and Noel met in the Congo in 1993. Marie–Louise was 18 years old and Noel was 35. According to Marie–Louise, after five months of dating, the two were married on December 23, 1993 in Kinshasa. She testified that Noel was not physically present at the wedding because "he was on assignment in [another country in] Africa and couldn't make the trip." Noel designated his cousin to represent him. One of the families gave the other $200 cash, clothes, and a live goat.[1] Noel participated in the ceremony over the phone. According to Marie–Louise, her family asked Noel and his family members three questions regarding whether Noel knew the bride, whether he liked her, and whether he wanted a dowry to be exchanged.[2] Noel responded in the affirmative.[3] According to Marie–Louise, "tradition requires that the wife leave[ ] with the husband's family and then go[ ] to live with the husband." After the ceremony, Marie–Louise spent the night at Noel's cousin's house. The next day she traveled to live with Noel in Arlington, Virginia.

■ Since the marriage, the couple have been living together and representing themselves as husband and wife. They first lived in an apartment in Virginia, then purchased a home in Bethesda, Maryland in January 1994. The parties bought another piece of property in Potomac, Maryland as "tenants

---

1. The record is unclear on the issue of whether Noel's or Marie–Louise's family provided the gifts.

2. Gifts given from a groom's family to the bride's family are commonly called a "bride-price," but are sometimes referred to as a "dowry." *See* Webster's Third New International Dictionary 276, 681 (2002). Gifts given from a bride's family to the groom's family are called a "dowry." *Id.* at 681.

3. Noel testified that he did not participate in this ceremony at all and was unaware of it; however, the trial court found that he did participate, and that finding is not clearly erroneous.

by the entirety."[4] The parties had three children together: P.E. was born on June 8, 1995, J.H. was born on October 29, 1997, and D.G. was born December 6, 1998.

On April 16, 1994, the parties participated in a "renewal of vows" ceremony at the Church of the Cathedral of Saint Thomas Moore in Arlington. The couple obtained a "Proof of Marriage" from the Congolese Embassy and brought it to the Virginia ceremony. The church provided them with a certificate stating that they were "united in matrimony ... in conformity with the laws of the State of Virginia and the Republic of Zaire." The certificate also attested that "there were witnesses present at the ceremony, including one member of [Noel's] family."

Noel applied for a "dependency allowance" for Marie–Louise with his employer (the World Bank) and attached a "Certificate of Customary Marriage from the Embassy of Zaire" or "*Attestation de Mariage Coutomier*" dated January 25, 1994. He requested and received health insurance coverage for Marie–Louise and asked the World Bank to "add my wife as beneficiary" of his life insurance policy. Noel also went to the United States Immigration Service to obtain permanent resident alien status (Green Card) for Marie–Louise, asserting that she was his wife. Since 1994, Noel has filed joint federal and state tax returns, listing Marie–Louise as his spouse. Further, during a protective order hearing, Noel referred to Marie–Louise as his wife. Although he filed an Amended Answer, when Marie–Louise first filed for absolute divorce Noel's Answer admitted that he and Marie–Louise were married. Finally, Noel wrote in his motion to dismiss Marie–Louise's complaint for absolute divorce, "the parties were joined in a union based on the Congolese practices ..."

At the circuit court hearing, Noel equivocated when asked about almost all of the above facts. He testified "he had no

---

4. A tenancy by the entireties is "the tenancy by which husband and wife at common law hold land conveyed or devised to them by a single instrument which does not require them to hold it by another character of tenancy." *Bruce v. Dyer*, 309 Md. 421, 427, 524 A.2d 777 (1987) (Internal quotations and citations omitted).

participation" in the Congolese marriage "by phone or any-way." He claimed he was "unaware of it." The court said that "[Noel] argued that the marriage ceremony in the Congo was something that is not recognized outside the Congo, but failed to provide support legal or otherwise for this assertion." He also said of the Virginia marriage: it is "customary for there to be a Catholic service for people not necessarily married to live in Virginia." The court entered a Judgment of Absolute Divorce. As to the validity of the marriage, the court found as follows:

[Noel's] actions subsequent to the ceremony in the Congo demonstrate [Noel's] recognition that there was a lawful marriage between the parties. [Noel] took action after the marriage ceremony in the Congo to have the marriage recognized by the World Bank by requesting a 'certificate of marriage' from the Congolese [E]mbassy. Although that document was not produced at trial, [Marie–Louise] pro-duced a document from the Embassy of the Democratic Republic of the Congo stating that a Certificate of Marriage was delivered to the World Bank and that due to "floods and destructive of archives," the embassy could not provide another copy.

Since 1994, [Noel] has filed a joint federal and state tax returns with [Noel] listing [Marie–Louise] as "spouse." [Noel] had titled real property that he purchased on Ray-mond Lane in Potomac, Maryland as "tenants by the entire-ty," which is a form of land ownership only available to married couples. Further, during the course of another hearing wherein [Marie–Louise] obtained a Final Protective Order against him, [Noel] referred to [Marie–Louise] as his "wife." [Noel] seeks to explain this designation by stating that "in the Congo, if you live with a woman she is called your wife and by respect I call her 'wife.'" Indeed, [Noel] went to the United States Immigration Service in order to obtain a 'green card' for [Marie–Louise] on her status as his wife.

[Noel's] prevarication on this issue becomes clearer upon consideration of his application for spousal dependancy ben-efits from the World Bank, which included an "Attestation

De [Mariage] Coutumier" (Certificate of Customary Marriage) dated January 25, 1994 to support [Noel's] claim of a legal marriage. [Noel] requested and received heath insurance coverage for [Marie–Louise] from the World Bank on the basis of [Marie–Louise's] status as his spouse. [Noel asked the World Bank to "add my wife as beneficiary" of his life insurance policy.

[Noel] is a liar and a manipulator. Either he lied to the [c]ourt in his testimony regarding the existence of the marriage and his participation therein or he lied to the World Bank, the Internal Revenue Service, and the immigration authorities. In either event his testimony is not to be believed. The [c]ourt finds that a valid marriage existed between the parties and took place on December 23, 1993.

Noel timely appealed.

## QUESTION PRESENTED

Appellant presents the following question for our review: [5] Did the Circuit Court err in recognizing the parties' marriage in Kinshasa, Democratic Republic of Congo?

For the following reasons, we affirm the Judgment of Absolute Divorce.

## DISCUSSION

### I. Standard of Review

 In this case, we are asked to review the circuit court's determination that Maryland would recognize the parties' marriage in the Democratic Republic of Congo. This is a mixed question of law and fact. On the one hand, on the

---

**5.** We have rephrased Appellant's question. In his brief, it was presented as:

Whether the Circuit Court erred in finding that on December 23, 1993, the parties were married in Kinshasa, Democratic Republic of Congo, when Marie–Louise failed to meet her burden of proof that a legal marriage occurred when the undisputed evidence was that Noel was not physically present at the wedding ceremony, and Marie–Louise failed to provide foreign law that this type of proxy marriage is recognized in Kinshasa, Democratic Republic of Congo, and thus should be recognized here.

question of whether there was a valid marriage based on the evidence presented, we give deference to the factual findings of the trial judge and will reverse only for clear factual error. *Hoang v. Hewitt Ave. Ass., LLC,* 177 Md.App. 562, 576, 936 A.2d 915 (2007) (Citations omitted). "A factual finding is clearly erroneous if there is no competent material evidence in the record to support it." *Id.* (Citations omitted). On the other hand, whether Maryland will recognize a valid foreign marriage is a purely legal determination. A circuit court's legal determinations are reviewed *de novo. Id.* (Citations omitted).

## II. The Parties' Marriage

Noel argues that Maryland should not recognize the Congolese marriage while Marie–Louise argues that we should. To determine this issue, we first decide if the marriage was valid in the Congo. If we answer yes, then we determine whether a Maryland court should recognize the marriage.

### A. The Validity of the Marriage Under Congolese Law

Noel attests that the record contains no proof of Congolese law,[6] and as such, the trial court could not have concluded that the marriage was valid under the law of the Congo. Instead, he contends, the absence of Congolese law demands that the court decide the validity of the marriage under Maryland law. He cites *Hall v. Hall,* 238 Md. 191, 195, 208 A.2d 593 (1965) and *Gebhard v. Gebhard,* 253 Md. 125, 128,

---

**6.** Noel also mentioned in his brief that Marie–Louise did not provide a notice of intent to use foreign law under Md.Code (1974, 2006 Repl. Vol.), Courts and Judicial Proceedings Article ("CJP"), § 10–504. Yet in the same breath, he argues "the court [was not] presented with foreign law from Marie–Louise validating this 'proxy' ceremony." The issue of notice is irrelevant if Marie–Louise did not rely on foreign law. Regardless, the issue was not raised below and therefore is not preserved. "A contention not raised below either in the pleading or in the evidence and not directly passed upon by the trial court is not preserved for appellate review." *Zellinger v. CRC Dev. Corp.,* 281 Md. 614, 620, 380 A.2d 1064 (1977). Noel did not raise the notice issue either in his pleadings or during the hearing. The circuit court did not address the issue in its opinion.

252 A.2d 171, 173 (1969) (If the record contains no proof of the law of another jurisdiction, the law is presumed to be the same as the laws of Maryland). We disagree with Noel because proof of foreign law is not required to raise a presumption of a valid foreign marriage.

When evidence suggests that the parties were lawfully married, it raises the presumption that the marriage was valid according to the law of the foreign state or country where it occurred. *Redgrave v. Redgrave*, 38 Md. 93, 97 (1873). Competent evidence of a marriage includes official records of a marriage, admissions or declarations of the husband and wife, statements of witnesses to the wedding, or any other evidence that is admissible under the general rules of evidence. *Wright v. State*, 198 Md. 163, 168–69, 81 A.2d 602 (1951). Indeed, "the admissions and declarations of the husband and wife have always been accepted in this State to prove their marriage." *Brell v. Brell,* 143 Md. 443, 448, 122 A. 635 (1923). "[W]here parties live together ostensibly as man and wife, demeaning [7] themselves towards each other as such, and are received into society and treated by their friends and relations as having and being entitled to that status, the law will, in favor of morality and decency, presume that they have been legally married." *Redgrave,* 38 Md. at 97 (Citations omitted).

In *Brell,* the Court of Appeals determined that a wife's testimony that she and her husband were married in Germany coupled with the husband and wife living together and having a deed and a mortgage in both names was sufficient evidence to regard the two as husband and wife. *Brell,* 143 Md. at 448, 122 A. 635. In *Redgrave,* the Court found a marriage to be valid where witnesses testified that the parties were married

---

**7.** Based on the context of the sentence, it appears that the Court was using a word in a fashion not commonly used today. According to The Oxford English Dictionary, one definition of "demeaning" is "[c]onduct, behavior, demeanor." The Oxford English Dictionary 433 (def. 2) (2d ed.1989). The dictionary considers it to be an obsolete word, except when being used in the context of "demeaning of oneself, comporting oneself." *Id.*

in Wisconsin, went to Iowa for two or three years, held themselves out as husband and wife, the community recognized them as husband and wife, and they had two children together. *Redgrave*, 38 Md. at 96–97. The evidence in this case exceeds that in *Brell* and *Redgrave*.

We start with the certificates of marriage.[8] Noel requested a certificate of marriage from the Congolese Embassy. The embassy provided the certificate entitled "Attestation De Mariage Coutumier" or Certificate of Customary Marriage. The certificate is dated January 25, 1994. The couple provided this certificate to Noel's employer (the World Bank) and to a Catholic church in Virginia when they appeared to renew their marriage vows. The Virginia church augmented the certificate with yet another certificate, this one stating that they were "united in matrimony . . . in conformity with the laws of the State of Virginia and the Republic of Zaire." The Virginia ceremony took place April 16, 1994.

We next review the testimony from Marie–Louise describing the wedding. Marie–Louise recounted the wedding that occurred in the Congo in December 1994: both parties' families were there; $200 cash, clothes, and a live goat were exchanged; Noel participated in the ceremony over the phone;

---

**8.** In Noel's reply brief, he advanced that the *Attestation De Mariage Coutumier* was entered into evidence "only to indicate why there is an absence of a certificate of marriage at the Democratic Republic of the Congo Embassy. As such, this document fails to offer any evidence that in fact a marriage occurred pursuant to the laws of the Congo . . ." This argument is without merit. The court admitted a letter from the Congolese Embassy, which stated that the embassy had lost the certificate of marriage due to flooding, into evidence and the court said that it was admissible only to show the absence of the marriage certificate. However Marie–Louise also introduced certified records from the World Bank that included a copy of the *Attestation De Mariage Coutumier*. The court admitted these documents without any limiting instruction on their admissibility. In its written opinion, the circuit court referred to the *Attestation* stating, "[Noel's] prevarication on this issue becomes clearer upon consideration of his application for spousal dependancy benefits from the World Bank, which included an "Attestation De Marriage Coutumier" (Certificate of Customary Marriage) dated January 25." The *Attestation De Marriage Coutumier* was admitted as substantive evidence.

Noel affirmatively responded that he knew the bride, he liked her, and he wanted the exchange of gifts so the bride could become his wife; Marie–Louise spent the night at Noel's cousin's house; and she traveled to live with Noel in Arlington, Virginia the next day.

We now focus on the couple's living situation and children. Noel and Marie–Louise first lived in an apartment in Virginia, then they purchased a home in Bethesda, Maryland in January 1994. The parties also bought a piece of property in Potomac, Maryland as "tenants by the entirety." As for children, the couple have three.

As further evidence of marriage, the couple also have held themselves out to the community as husband and wife. Noel applied for a dependency allowance for Marie–Louise with his employer. He requested and received health insurance coverage for Marie–Louise and added her to his life insurance policy. Noel went to the United States Immigration Service in order to obtain a Green Card for Marie–Louise based on her status as his wife. Since 1994, Noel has filed joint federal and state tax returns, listing Marie–Louise as his spouse.

Finally, Noel has also proclaimed several times, under oath, that he and Marie–Louise were married. For example, during a protective order hearing, Noel referred to Marie–Louise as his wife. Additionally, although he later filed an Amended Answer, Noel's first Answer admitted that he and Marie–Louise were married. He also wrote a motion to dismiss that stated, "the parties were joined in a union based on the Congolese practices, that basically consists of an agreement between families whom make an agreement to cohabitate in their villages, however, it is not a recognized marriage outside of the Congo." In light of all these facts, we find Marie–Louise provided a plethora of evidence to raise a presumption that the Congolese marriage was a valid marriage according to the law of the Congo. It was incumbent on Noel to rebut the presumption, and he presented no evidence to do so.[9]

9. Because the circuit court correctly found that the parties' marriage was valid in the Congo, there is no need to address the issue of whether the couple was validly married under Virginia law.

## B. Honoring a Valid Foreign Proxy/Phone Marriage

 In deciding whether a valid foreign marriage will be acknowledged in Maryland, courts employ the doctrine of comity. *Henderson v. Henderson*, 199 Md. 449, 457–58, 87 A.2d 403 (1952). Under this doctrine, Maryland "will give effect to laws and judicial decisions of another state or jurisdiction, not as a matter of obligation but out of deference and respect." *Wash. Suburban Sanitary Comm'n v. CAE–Link Corp.*, 330 Md. 115, 140, 622 A.2d 745 (1993) (Citations omitted). In other words, Maryland courts will honor foreign marriages that were valid where performed, even if the marriage would not have been valid if performed in Maryland. *Henderson*, 199 Md. at 458, 87 A.2d 403. There are two exceptions to this general rule. First, the marriage must not be expressly prohibited by the General Assembly. Second, the marriage must not be repugnant to Maryland public policy. *Port v. Cowan*, 426 Md. 435, 444–45, 44 A.3d 970 (2012) (Citations omitted).

 Noel assumes that Maryland does not recognize proxy marriages [10] performed in this State. However, Noel's description of the Congo marriage as a "proxy marriage" is a misnomer, since the circuit court found that Noel did participate over the phone. Regardless, because we find that the marriage is presumed to be valid under the laws of the Congo, we do not need to determine whether Noel's assumption about proxy marriage is correct. Instead, we will recognize a foreign marriage as long as the marriage is not prohibited by the General Assembly or repugnant to Maryland public policy. These exceptions rarely invalidate a marriage because Maryland liberally recognizes foreign marriage to promote "uniformity in the recognition of the marital status ..." *Henderson*, 199 Md. at 458, 87 A.2d 403.

 Regarding the statutory prohibition exception, Md.Code (1984, 2006 Repl.Vol.), Family Law Article ("FL")

---

10. A proxy marriage is "[a] wedding in which someone stands in for an absent bride or groom." Black's Law Dictionary 995 (8th ed.2004).

§ 2–406 describes who can perform a marriage ceremony and when the ceremony must be performed.[11] Neither this law,

---

11. Section 2–406 provides:
(a) Authorized officials.—
(1) In this subsection, "judge" means:
(i) a judge of the District Court, a circuit court, the Court of Special Appeals, or the Court of Appeals;
(ii) a judge approved under Article IV, § 3A of the Maryland Constitution and § 1–302 of the Courts Article for recall and assignment to the District Court, a circuit court, the Court of Special Appeals, or the Court of Appeals;
(iii) a judge of a United States District Court, a United States Court of Appeals, or the United States Tax Court; or
(iv) a judge of a state court if the judge is active or retired but eligible for recall.
(2) A marriage ceremony may be performed in this State by:
(i) any official of a religious order or body authorized by the rules and customs of that order or body to perform a marriage ceremony;
(ii) any clerk;
(iii) any deputy clerk designated by the county administrative judge of the circuit court for the county; or
(iv) a judge.
(b) Period during which ceremony may be performed.—Within 6 months after a license becomes effective, any authorized official may perform the marriage ceremony of the individuals named in the license.
(c) Performance by unauthorized individual prohibited; penalty.
(1) An individual may not perform a marriage ceremony unless the individual is authorized to perform a marriage ceremony under subsection (a) of this section.
(2) An individual who violates this subsection is guilty of a misdemeanor and on conviction is subject to a fine of $ 500.
(d) Performance between individuals within prohibited degrees prohibited; penalty.—
(1) An individual may not knowingly perform a marriage ceremony between individuals who are prohibited from marrying under § 2–202 of this title.
(2) An individual who violates the provisions of this subsection is guilty of a misdemeanor and on conviction is subject to a fine of $ 500.
(e) Performance without license prohibited; penalty.—
(1) An individual may not perform a marriage ceremony without a license that is effective under this subtitle.
(2) An individual who violates the provisions of this subsection is guilty of a misdemeanor and on conviction is subject to a fine not exceeding $ 500.
(f) Ceremony performed by a clerk or deputy clerk.—The county administrative judge of the circuit court for the county shall designate:

nor any other statute, precludes Maryland from recognizing a ceremony where one party participates by proxy—or in the manner that occurred here—and the ceremony is valid in another jurisdiction. To preclude validity, the statute must unequivocally void such marriages. *Port,* 426 Md. at 447, 44 A.3d 970 (Citations omitted). The General Assembly has not prohibited recognition of a foreign marriage such as the one that occurred here.

We also find that neither proxy nor phone marriages are repugnant to Maryland public policy. Maryland's attitude is that marriage should not be set aside lightly. *Picarella v. Picarella,* 20 Md.App. 499, 504, 316 A.2d 826 (1974) (Citations omitted). As such, several types of marriages that would not have been valid if performed in Maryland have been recognized in Maryland. Just recently, in *Port,* the Court of Appeals found that valid out-of-state same sex marriages are not repugnant to Maryland public policy, despite the existence of a Maryland statute limiting marriage to a man and a woman. *Port,* 426 Md. at 450–51, 44 A.3d 970. In *Henderson,* the Court of Appeals recognized an out-of-state common law marriage, finding that an absence of the proper form and ceremony does not make a marriage contrary to public policy. *Henderson,* 199 Md. at 459, 87 A.2d 403. This State has even recognized an out-of-state uncle-niece marriage, which would have been a misdemeanor if attempted to be formed in Maryland, in *Fensterwald v. Burk,* 129 Md. 131, 138–39, 98 A. 358 (1916).

A Maryland court has never found a valid foreign marriage repugnant to public policy. The closest an appellate decision came was in 1952, in *Henderson,* where the Court of Appeals suggested in dicta that a valid out-of-state interracial marriage

(1) when and where the clerk or deputy clerk may perform a marriage ceremony; and

(2) the form of the marriage ceremony to be recited by the clerk or deputy clerk and the parties being married.

(g) Forms of religious ceremonies.—This section does not affect the right of any religious denomination to perform a marriage ceremony in accordance with the rules and customs of the denomination.

would not be recognized in Maryland. *Henderson,* 199 Md. at 459, 87 A.2d 403. This dicta has been discredited by case law and statute. *See Conaway v. Deane,* 401 Md. 219, 304 n. 66, 932 A.2d 571 (2007); 1967 Md. Laws 6. However, it demonstrates the level an otherwise valid marriage must reach to be repugnant to public policy. At that time, an interracial marriage was an infamous crime. The penalty was imprisonment for not less than 18 months, but not more than 10 years. In a case not dealing with marriage, but a valid foreign divorce, *Aleem v. Aleem,* 404 Md. 404, 947 A.2d 489 (2008), Maryland declined to recognize a divorce valid in Pakistan. *Id.* at 422–23, 947 A.2d 489. A husband obtained an *ex parte* divorce at the Pakistani Embassy in Washington, D.C. *Id.* at 406, 947 A.2d 489. Under Pakistani law, a husband has the right to obtain a divorce without notice to his wife. *Id.* at 422, 947 A.2d 489. Maryland found it was contrary to public policy because it violated Article 46 of Maryland's Declaration of Rights, providing that "[e]quality of rights under the law shall not be abridged or denied because of sex." *Id.* (Citations and internal quotations omitted).

In contrast, a proxy marriage performed in Maryland carries no criminal penalty for the couple or the celebrant. Also, these types of marriages do not infringe equal rights principles like the one-party divorce in *Aleem.* In fact, unlike a common law marriage, a same-sex marriage, or an uncle-niece marriage, no law suggests that proxy or phone marriages would not be permitted when performed in Maryland. It is true that one secondary source, a family law treatise, hypothesizes, "it is doubtful that Maryland would ever recognize proxy marriages, marriage by telephone, or marriage by mail." 1–3 Bender's Maryland Family Law § 3–4(c). But this hypothesis originated with a dated Maryland Law Review article written in 1938. At that time in Maryland, a religious ceremony was a mandatory part of a legal marriage. The article doubted that a proxy or phone marriage would be valid "under the policy of the religious ceremony." John S. Strahorn, Jr., *Void and Voidable Marriages in Maryland and Their Annulment,* 2 Md. L.Rev. 211, 222 (1938). According to the article, these

types of marriage may not evidence that an "actual contract" had been made and "a solemn act" had been performed. *Id.*

This theory is outdated for two reasons. One, Maryland no longer requires a religious ceremony as part of a marriage. *See* FL § 2–406. Two, modern communication technology reduces the likelihood that the absent individual can claim he or she did not enter into an actual contract or commit a solemn act. Indeed, the power of modern communication to eliminate the suspicions of proxy marriage is not a new idea. In 1964, the Supreme Court of Oregon expressed, "[t]he most often voiced objection to proxy marriages is that unbeknownst to the celebrants the power of attorney may have been revoked prior to the celebration of the marriage. With the many accurate and prompt modern methods of communication available, the possibility of a failure to communicate revocation is extremely slight." *State v. Anderson,* 239 Or. 200, 206, 396 P.2d 558 (1964) (Citations omitted).

Although Maryland has not adopted it, the Unif. Marriage & Divorce Act, 9A U.L.A. 182 (1998), permits proxy marriage. Specifically, the Act declares "[i]f a party to a marriage is unable to be present at the solemnization, he may authorize in writing a third person to act as his proxy. If the person solemnizing the marriage is satisfied that the absent party is unable to be present and has consented to the marriage, he may solemnize the marriage by proxy. If he is not satisfied, the parties may petition the . . . court for an order permitting the marriage to be solemnized by proxy." *Id.* at § 206(b). The comment to this portion of the act further explains that "there are many reasons why, in individual cases, couples may prefer such a ceremony. So long as the marriage license procedure has been followed and the official performing the ceremony has no reason to doubt the intentions of the absent prospective spouse, there is no reason why a proxy marriage should be prohibited." *Id.* at § 206 cmt.

A few states by statute also allow some form of proxy marriage. *See* Cal. Fam.Code § 420(b) (West Supp.2012); Colo.Rev.Stat. Ann. § 14–2–109(2) (West 2005); Mont.Code Ann. § 40–1–301(2) (2009); Tex. Fam.Code Ann. § 2.203(b)

(West 2006). Still other courts have found proxy marriage is not contrary to state public policy. *See Barrons v. United States,* 191 F.2d 92, 97 (9th Cir.1951) (finding proxy marriages consistent with Nevada marriage laws where one party was in Africa and the other in California because of the long history of proxy marriage in other states and the fact that Nevada has no law prohibiting proxy marriage); *United States ex rel. Modianos v. Tuttle,* 12 F.2d 927, 929 (E.D.La.1925) (validating a marriage ceremony celebrated in Turkey while husband remained in Louisiana but was represented by proxy because Louisiana law prohibiting marriage by proxy was not applicable to marriages outside Louisiana, the proxy marriage was for convenience, and husband and wife had since been married according to Louisiana law); *In re Blankenship,* 133 B.R. 398, 400 (Bankr.N.D.Ohio 1991) ("Ohio does not authorize the performance of proxy marriages due to the statutory requirements of personal presence of the parties at the ceremony, although it will recognize proxy marriages when performed in a state where such marriages are valid.") (Citations omitted); *State v. Anderson,* 239 Or. 200, 206, 396 P.2d 558 (1964) (finding proxy marriages consistent with Oregon marriage laws where one party was in jail because the difficulty in appointing a proxy eliminates a likelihood of mischief, and modern methods of communication eliminate the fear that one party would not be able to revoke authority before the ceremony).

Distant marriages are becoming more and more common. Notably, two law professors at Michigan State University have been conducting a study, the E–Marriage Project, since 2008. *See* Bob Kuszynski, *Do Couples Need to Be in the Same Place to Get Married? Two Michigan Professors Say 'No',* Scripps TV Station Group (Oct. 6, 2011), http://www.wxyz.com/dpp/news/marriage-by-skype. The study looks at the marriage ceremonies of the 50 states. *Id.* The two professors believe that states should go so far as to permit couples to marry using videoconferencing technologies such as Skype.[12] *Id.*

---

12. Skype is a voice communication service that uses the internet to provide a variety of features including two-way audio and video communication. *See* http://www.skype.com.

They call this proposal "modernizing marriage," and they compare a Skype marriage with other major business contracts that take place over videoconference every day. *Id.*[13]

The mounting recognition and research on distant marriages suggest that sometimes it may be a couple's only option. The men and women who serve in our armed forces sacrifice a great deal of control over their daily lives for this country and they often are married by proxy. *See* Andrea B. Carroll, *Reviving Proxy Marriage*, 76 Brook. L.Rev. 455, 492 (2011). In addition, modern employment commitments often uproot one party from home for long periods of time. This may make personal participation in a marriage ceremony impracticable. *Id.* at 458. Not permitting marriages by proxy or by phone could deprive these couples of the emotional and legal benefits that accompany marriage. *See id.* Noel and Marie–Louise's marriage seems to illustrate such a situation. Noel was working in another country for the World Bank, yet the couple was still able to have a wedding ceremony in their native country with Noel participating by phone.

For these reasons, we are not persuaded that a marriage by proxy or by phone rises to the level of being repugnant to public policy. The types of marriages are not specifically prohibited by law, do not harm the liberties of either spouse, and it is not inconceivable in the future that such a marriage may be valid when performed in Maryland. The parties' marriage in the Congo, where someone stood in for Noel and Noel participated by phone, was valid in the Democratic Republic of the Congo and Maryland courts would find it valid in this State under the doctrine of comity. Recognizing that the parties' marriage was valid, the circuit court did not err in granting a divorce, awarding alimony, dividing property, calculating child support, or awarding attorney's fees.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

---

**13.** We express no view on whether a "Skype marriage" would be valid in this State.